IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LAWRENCE JAMES NAPPER,    §
TDCJ #1080356,    §
       Petitioner,    §
     §
v.    §          CIVIL ACTION NO. H-10-3550
     §          (consolidated with No. H-10-3551)
RICK THALER, Director,    §
Texas Department of Criminal Justice -    §
Correctional Institutions Division,    §
     §
       Respondent.    §

## MEMORANDUM AND ORDER

State inmate Lawrence James Napper (TDCJ #1080356) has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging state court convictions for aggravated kidnapping and aggravated sexual assault of a child. The respondent has answered with a motion for summary judgment, arguing that the petition must be denied [Doc. # 30]. Napper, who is represented by appointed counsel in this case, has filed a reply [Doc. # 35]. After considering all of the pleadings, the state court records, and the applicable law, the Court grants the respondent's motion, denies the petition, and dismisses this case for reasons that follow.

## I.   BACKGROUND AND PROCEDURAL HISTORY

A Harris County grand jury returned an indictment against Napper in cause number 886346, charging him with aggravated kidnapping of a six-year-old child. The grand jury returned a separate indictment against Napper in cause number 886345, charging him with

aggravated sexual assault of that same child.  The State enhanced those indictments for purposes of punishment with allegations that Napper had at least two prior felony convictions for rape and aggravated rape.  As a habitual offender, Napper faced a potential sentence of 25 years to life in prison if convicted of the charged offenses.  A jury in the 182nd District Court of Harris County, Texas, found Napper guilty as charged.  On November 9, 2001, the same jury found that the enhancement allegations were true and sentenced him to life imprisonment in both cases.[1]

On September 29, 2010, Napper filed a federal habeas corpus petition under 28 U.S.C. § 2254, seeking relief from his convictions for aggravated kidnapping and aggravated sexual assault of a child in cases 886345 and 886346 on the following grounds:  (1) the State engaged in bad faith by destroying evidence in the form of genetic material, or DNA, in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1994); (2) one of the State's witnesses (a chemist at the Houston Police Department Crime Lab) gave false testimony at trial; and (3) he was denied effective assistance of counsel at trial because his defense attorney did not hire a DNA expert or move for a continuance to conduct additional DNA testing of available evidence.  As outlined further below, these claims were adjudicated on the merits on state habeas corpus review under Article 11.07 of the Texas Code of Criminal Procedure.  In that proceeding, the Texas Court of Criminal Appeals concluded that all of Napper's claims were

---

[1]     At punishment, the State presented evidence that Napper had prior felony convictions for rape (1979), false imprisonment (1979), aggravated rape (1981), rape (1981), and indecent exposure (1993).  Because Napper had multiple prior convictions for rape and aggravated sexual assault, he automatically received a life sentence.  *See* TEX. PENAL CODE § 12.42(c)(2).

"without merit" and denied relief in a lengthy published opinion.  *See Ex parte Napper*, 322 S.W.3d 202, 205 (Tex. Crim. App. 2010).

In adjudicating Napper's claims, the Texas Court of Criminal Appeals composed a detailed summary of the pretrial investigation, the evidence presented at trial, and subsequent evidentiary proceedings.  This Court will not repeat the state court's findings in full.[2]  The following summary, however, is necessary to provide an overview of the proceedings that are pertinent to Napper's claims on federal habeas corpus review.

### A.   The Offense and Investigation

Before summarizing the evidence presented at trial, the Texas Court of Criminal Appeals described the facts underlying the charges and the pretrial investigation, which included evidence of genetic material, or DNA, that was tested at the Houston Police Department ("HPD") Crime Lab:

A. Before Trial

1. The Kidnapping

On February 11, 2001, six-year-old "E.T." was kidnapped.  One of E.T.'s friends was ten-year-old Remington Allen.  While E.T.'s mother worked that day, Remington's grandmother cared for E.T., his nine-year-old brother "Junior," and his ten-year-old sister Denetta.  Remington, Junior, and their friend Carlos went to a nearby park.  Denetta and E.T. walked with them, but crossed the street to go to a store.  Denetta went inside the store.  E.T. may have accompanied her, but at some point he was outside again.  While

---

[2]     The published opinion by the Texas Court of Criminal Appeals is nearly 50-pages long and contains 183 footnotes.  In setting out portions of this opinion, some of the authority referenced in the footnotes has been moved to the text where possible.  Where it has not been possible or practical to include footnotes, this Court has simply indicated that footnotes have been omitted from portions of the text.

Remington, Junior, and Carlos played at the park, they saw a man drive up in a car and tell E.T. to "come here." Remington told E.T. not to get in the car.

The trial testimony of the children diverged somewhat at this point. Remington testified that the man got out of the car and acted like he was picking something up. Remington also testified that he saw the man hand E.T. some money when E.T. got into the car. However, on cross-examination, Remington agreed that he never saw the man. Junior testified that he saw the man inside the car and that the man had a mustache and was wearing sweats. On cross-examination, Junior agreed that he did not remember much about the car or the man inside the car because he did not see the man. Junior further testified that he did not know if the man ever got out of the car. E.T. testified that the man tried to get him to take money and then got out and put him in the car.

Remington, Junior, and E.T. all testified that the car sped away quickly once E.T. was in it. Junior and Remington chased the car. Remington picked up his scooter and threw it at the car, but the car did not stop. The children remained at the park for "a little bit" to see if the man would bring E.T. back. The children then went to "Momma Ruth's" place, which was close by, but no adults were home, so they went back up the street to Remington's grandmother's house. At first, Remington's grandmother did not believe the children's story about E.T. being kidnapped, but once she became convinced, she called the police.

At trial, Remington described the car as a "burgundy-like" Oldsmobile with a white top. When asked whether the wheels were shiny, he responded negatively. Junior testified that the car was dark green with a blue top, and scratches at the top. Both Remington and Junior testified that they had picked out a car in a videotape lineup, but they were not asked which car they picked.

Houston Police Officer D.D. Thompson was dispatched to the scene at 3:12 p.m. and arrived at 3:19 p.m. According to Officer Thompson, the children described the kidnapper's vehicle as an Oldsmobile—some said a Monte Carlo. He explained that the "children couldn't pinpoint exactly what make and model it was." The descriptions and the colors given by the children were not consistent. The car was variously described to him as a two-door or a four-door, as dark blue or dark green, with a rusty top or a black top or a vinyl top, and with chrome wheels. Officer Thompson dispatched a description that included model years from 1980 to 1990.

4

Sergeant Larry Hoffmaster testified that Junior described the car as a mid-sized gray car with chrome rims and with damage to the front around the headlights. Sergeant Hoffmaster further testified that the children were taken to a police sketch artist to make a composite drawing of the suspect. The general broadcast for the suspect indicated a "skinny black male," but Sergeant Hoffmaster acknowledged that [Napper] was not skinny. When asked if he developed any suspects whose vehicles were black or dark in color, Sergeant Hoffmaster said no.

### 2. Aftermath

E.T. was returned to the neighborhood the next day. He was crying, and his face was bruised and swollen. E.T., who is African–American, described his kidnapper as having skin color that was a little darker than his own. E.T. described the man as having no facial hair, wearing eyeglasses, wearing a black hat, and wearing a purple jacket with green (or a purple and green jacket) and matching purple pants. E.T. described the car as a dark navy blue in color, like his tennis shoes, with a brown interior, and with a black console between the front two seats.

E.T. related that the man offered him money, and when E.T. got closer, the man pulled him into the car. The kidnapper took E.T. to a house that had a brown couch in the front room and a television next to the bed in the bedroom. He tied E.T.'s arms and legs to the corners of the bed. E.T. also said that the man rubbed "orange grease" on his body. The man told E.T. that "if I tell anybody he's going to kill me." When asked if he had been touched inappropriately, E.T. "clammed up" and started "tearing up." When asked by another officer what happened after he was tied to the bed, E.T. became extremely upset, crying and breaking down into hysterics.

E.T. was taken to the hospital the day he was returned. Pursuant to instructions from Chemist Reidun Hilleman at the HPD Crime Lab, Officer Lorenzo Verbitskey swabbed E.T.'s face. Verbitskey let the resulting two swabs air dry in his office. He then delivered the swabs to Hilleman. Hilleman also received anal and oral swabs and clothing. Hilleman gave the swabs to Mary Childs-Henry, a forensic biologist at the HPD Crime Lab who analyzed body fluids and conducted serology testing. Childs-Henry extracted two tubes of DNA from each of the face swabs (four tubes in all). For each swab, one of the tubes contained a sperm fraction and the other tube contained an epithelial fraction of the genetic material. She then discarded the original swabs.

5

E.T. subsequently made an outcry to his aunt, Tangela Harding: E.T. described his kidnapper as wearing a baseball hat, wearing eyeglasses, and having a short haircut. The house had two rooms, and they went up some stairs to get into the house. The man said he was going to pull out his thing (Tangela understood E.T. to be referring to his penis) and wanted E.T. to put it in his mouth. When E.T. said no, the man started slapping him. So E.T. complied, his mouth started hurting, and the man "wet his face." This outcry was relayed to the police on February 14th. That same day, E.T. was taken to have two composite sketches done of his kidnapper — one with eyeglasses and one without.

Joseph Chu, a chemist at the HPD Crime Lab, received the four tubes of DNA that had been derived from the face swabs. Chu's typing of the DNA was completed on February 20th. Chu effectively consumed the entire sample in all four tubes during testing. He determined that the sample was a mixed sample and that DNA patterns within the sample showed that a portion of the sample was consistent with E.T.'s DNA. He did not at that time have any information regarding the identity of any other contributor.

On February 23rd, E.T. told Officer Shawn Valenta that the kidnapper referred to his house as "his friend's house." E.T. described the house as wood frame, with about four concrete steps, and a number "2" on the front of the building. [Napper] was not in custody at the time E.T. communicated this information.

Later that day, police received a Crime Stoppers tip implicating [Napper]. Sergeant Hoffmaster obtained a photograph of [Napper] and compared it to the composite; he could not eliminate [Napper] as a suspect based upon a comparison of the two. Sergeant Hoffmaster discovered that [Napper] had an outstanding parole warrant and went to [Napper]'s house at 8602 Alsuma. The house matched the description given by E.T.: a white wood frame home with a concrete sidewalk leading to two concrete steps in the front and the number 2 in the address. The address was on the mailbox and above the door to the house. The car parked in front of the house was a 1982 Buick Regal, with white vinyl over dark gray. The interior of the car was brown with gray. There was no grille in the front and there was damage around the headlights.

[Napper] was arrested on the parole warrant at 10:00 p.m. that day. On February 24th, the police obtained a search warrant for [Napper]'s house, car, and body. Police discovered that [Napper]'s house had two rooms that were

in use: a living room and a bedroom. The living room contained only one piece of furniture: a brown sofa. In the bedroom was a four-poster bed with a headboard and a footboard, a television on a stand beside the bed, and a nightstand beside the bed. On the nightstand was a bottle of orange cocoa butter lotion. A Houston Oilers cannister and purple pants were also found in the house. A dark baseball cap and a multicolored windbreaker with dark sleeves and a purple inlay was recovered from the vehicle.

The next day, Sergeant Hoffmaster recorded a videotaped lineup that included [Napper]. He also recorded a video lineup that included [Napper]'s car and four other cars. Before the video lineup of [Napper] was shown, witnesses were told to view the entire videotape and see if they recognized anyone, "and if they didn't recognize anyone they should tell us that, that it was okay to do that." In addition, they were told to view the entire tape before saying anything or making any decisions. When the suspect-lineup video panned on [Napper] (in the number three position), a big smile came upon E.T.'s face, but E.T. continued to watch the rest of video. As soon as he was asked if he recognized anyone, E.T. immediately pointed to [Napper] and said, "That's the man that took me to his friend's house." E.T. indicated that he was positive in his identification. E.T. also identified [Napper]'s car in the vehicle lineup.

On February 28th, Chu received [Napper]'s reference sample for DNA testing. It was found to be consistent with the remaining portion of the DNA from the face swabs.

On March 15th, E.T. told Officer Valenta that [Napper] had placed his private part in his mouth and peed in his mouth. When asked what he meant by private part, E.T. pointed to his penis.

*Ex parte Napper*, 322 S.W.3d at 205-08 (footnotes omitted). In addition to this summary, the Texas Court of Criminal Appeals reviewed a table that summarized the results obtained by HPD Chemist Joseph Chu, who tested "the face-swab DNA contained in the four tubes and from the victim's and Napper's reference samples." *Id.* at 208. According to that table, all alleles recovered from the sperm samples "matched [Napper's DNA] profile." *Id.* at 210. The Texas Court of Criminal Appeals noted that Chu consumed all of the sample during the

7

testing process, with the exception of "microscopic residue adhering to the walls of the tubes." *Id.* at 207, n.2.

Napper's defense counsel, Steven Greenlee, filed a pretrial motion to preserve forensic evidence for independent testing, which also requested "a defense DNA expert at county expense to conduct the independent analysis and to testify at trial." *Id*. at 211. Greenlee did not pursue his motion after he learned from prosecutors that, according to Chu, the sample had been "used up in the HPD Crime Lab's analysis." *Id.* Greenlee was not told, however, about the microscopic residue that remained after Chu had completed his tests. As a result, there was no independent test done of the genetic material prior to trial. *Id.*

## B.    Napper's Trial

In addition to facts disclosed during the investigation, the State presented physical evidence at trial to corroborate the victim's testimony. The State also presented testimony about the genetic material that was recovered by HPD Forensic Biologist Mary Childs-Henry and tested at the HPD Crime Lab by Joseph Chu, which evidence linked Napper to the offense:

> . . . [T]estifying by closed-circuit television, E.T. related the events of his kidnapping. He testified that his kidnapper wore a purple jacket, purple sweat pants, eyeglasses, and a blue hat. E.T. described the car that he was pulled into as being light brown inside. E.T. said that he was taken to a white, wood house with the numbers 2, 1, and 6 on it. He further testified that he went up concrete stairs to get into the house. Inside the house was a brown couch and a black television. E.T. said that the kidnapper tied him to the bed, with his "feet back" and his "hands in the front." When asked, "Did he tie you to parts of the bed with clothes?" E.T. answered, "Yes." E.T. testified that the television was on the side by the bed. With the help of anatomically correct dolls, E.T. testified that the kidnapper put his "private" in E.T.'s mouth. The

kidnapper subsequently gave E.T. a bath, but did not wash his face.  The next day, the man took E.T. back to the store where he had been abducted, and E.T. then went to Remington's grandmother's house.

E.T. testified that he had previously pointed out the man who kidnapped him on a video lineup.  When shown photographs of [Napper]'s purple jacket and pants, E.T. testified that they looked like the ones his kidnapper had worn. E.T. also testified that [Napper]'s house and concrete steps, depicted in photographs, looked like the place the kidnapper had taken him to, and E.T. pointed to circles on the sidewalk that he remembered seeing.  E.T. also testified that a brown couch and a Houston Oilers cannister that were depicted in photographs were items he had seen in the kidnapper's house.  However, when the camera panned around the courtroom and E.T. was asked to identify his assailant, he did not do so.

The State questioned Childs-Henry and Chu regarding their roles in subjecting the face-swab samples to DNA analysis. The focus of the State's questioning was on the semen fraction of the DNA samples.

Childs-Henry testified regarding her role in extracting DNA material from the face swabs for analysis.  Although the quantity of the sample was small, she determined that enough DNA was present for analysis.   On cross-examination, defense counsel questioned Childs-Henry concerning the DNA extraction protocol. Childs-Henry could not say how many steps were in the extraction protocol that she followed.

When asked whether an entire DNA sample could be consumed by testing, she responded that such a thing could happen "if you are a sloppy chemist" or "if there's not enough sample."  When asked whether the sample was large enough not to have been completely consumed by testing, Childs-Henry responded affirmatively, and she responded that the sample in this case was not entirely consumed.  "So there's a DNA sample left?" defense counsel asked.  "Yes, there is," she responded.  "And this was after Mr. Chu had done his analysis?" defense counsel queried further.  "Yes," Childs-Henry replied.

Chu testified regarding his role in analyzing the DNA sample after it had been extracted. Chu explained that he had a Master's degree in Chemistry, that he completed in-house training as well as outside agency training on DNA analysis, and that he had to pass a proficiency test twice each year on federal guidelines.  Chu had been working eight years in the DNA section of the HPD Crime Lab.

9

Chu testified that he conducted the STR method of DNA analysis. He determined that the DNA was a mixture of two individuals. One half was consistent with E.T.'s DNA, he explained, while the other half was consistent with [Napper]'s. "Statistically," the DNA results from the face swab material "matched" [Napper]. The odds of a random match with an individual other than [Napper] was about the human population of the planet. Chu later testified that he could be about 99.999 percent sure DNA from that swab sample was [Napper]'s, or about a one–in–1.3 trillion possibility of a random match with another individual. Chu also testified that he conducted a cross analysis of the DNA from both swabs to make sure that they were consistent with each other.

On cross-examination, Greenlee questioned Chu regarding whether any DNA material was left for independent analysis. Chu said that no evidence was left for re-analysis. "Very unfortunately, this case it's very small amounts," he said, "I have to consume." Chu also testified that there were ways to determine whether the sample was contaminated. There were strict guidelines in the laboratory to monitor contamination; controls in the DNA test itself would indicate whether contamination was present. So, if a mistake were made, Chu testified, it would show up. "In this case we don't have any contamination in the laboratory to cause misleading results," he explained. Greenlee's cross-examination of Chu covered approximately six pages of the trial record.

*Ex parte Napper*, 322 S.W.3d at 211-12 (footnote omitted). After the State rested its case,

Napper attempted — without much success — to establish an alibi by presenting testimony

from friends and family members about his activities on the day of the kidnapping. *See id.*

at 212-13. At Napper's insistence, defense counsel also presented testimony from two of his

parole officers and from Napper, who denied committing the offense:

Against his professional judgment, Greenlee called [Napper]'s parole officers, Butler and Ford, to the witness stand because [Napper] insisted that he do so. Greenlee discussed his reservations with the trial court, but [Napper] insisted that calling these witnesses was essential to establishing an alibi by showing that he was on electronic monitoring. [Napper] also expressed the opinion that he would have to "come behind" these witnesses and testify, even though he knew that doing so would enable the jury to learn his prior criminal

10

record.  [Napper] reiterated his prior frustrations with his attorney, referred to what he considered to be an earlier request to represent himself, and indicated that he personally needed to question some of the witnesses "because all the facts of this case is not being brought out by my attorney, and he will not do it himself."

The parole officers testified that [Napper] was on parole for rape and aggravated rape.  [Napper] was on the highest level of supervision — the Super Intensive Supervision Program (SISP).  This program included electronic monitoring.  For a while, [Napper] was on GPS monitoring.  At that time, only twenty-five people in the entire state were on that kind monitoring.  [Napper] was taken off GPS monitoring on December 12, 2000, and placed on a more traditional form of electronic monitoring, which recorded only whether [Napper] was at home.  [Napper] was required to report to his parole officer once a week, every Wednesday.

Under SISP, restrictions were placed on where [Napper] could go and when he could be there, and curfews were imposed.  Where [Napper] could go and when he could be there depended upon the weekly schedule made out by his parole officer.  On February 11th, [Napper] was allowed to leave the house at 10:00 a.m. to go to church until noon, and then he was allowed to go to his friend Ben's until 5:30 p.m.  Newbury Street was not a place that he was allowed to go that day.

On February 18, 2001, a parole warrant issued against [Napper] for a curfew violation.  [Napper] told his parole officer that he was delayed in getting home that day because of a flat tire, and he showed a tire in his car with a screwdriver sticking out of it as proof.  The warrant was in the TCIC system, but [Napper]'s parole officers chose to investigate the warrant, and a decision was later made to withdraw it, but [Napper] was arrested on the warrant before it was withdrawn.

Finally, [Napper] testified.  [Napper] denied having anything to do with E.T.'s abduction and sexual assault.  [Napper] confirmed that he was on parole for aggravated rape.  [Napper] said that he received permission from his parole officer to go to Newbury Street, but the parole officer just would not admit it.  Defense counsel asked, "You heard Mr. Butler testify; is that correct?" [Napper] responded, "I heard him lie, yes."  When asked by defense counsel when he informed Butler that he would be visiting the Newbury residence on February 11th, [Napper] first responded that he would have told him on the 21st, when he visited the parole office.  When Greenlee explained that the time

11

frame had to be before Sunday, February 11th, [Napper] responded that he gave notice the Friday before, February 9th. [Napper] further testified that he had no regularly scheduled reporting day — he just had to report every week. When confronted with the fact that Ford and Butler said it was every Wednesday, [Napper] retracted his earlier statement and confirmed that he was required to report every Wednesday.  Then [Napper] claimed that he told Butler about going to the Newbury address on February 7th.  When asked what his schedule was like on that Sunday, [Napper] replied, "Oh, it's different times, different Sundays that I am doing different things on different days. What particular Sunday are you asking me about?"

Greenlee further asked, "You heard [Butler] testify that your initial movement on Sunday was restricted to going to church, did you hear that?" [Napper] responded, "Yeah, I heard him say it, but he's lying. He's lying. He knew I was going over there."  Defense counsel later asked, "It's your testimony you had authority or permission to go to Newbury?" [Napper] replied, "That's true."

[Napper] also testified that there was no damage to his car, and that the police department tore it up because they were the only ones that had access to the car. He testified that he left the Newbury address at around 2:30 to 2:35. He said that he did not go straight home because he stopped to get some gas, and then ran by Ronnie's house.

When asked whether he was familiar with the Southmore and Live Oak, Southmore–288 area, [Napper] responded that he was, because he had been there in November or December looking for his "brother's sister" who was on drugs.  [Napper] agreed that it was a restricted area and that he was in violation of his parole.  But then [Napper] claimed that it was not a parole violation to drive through the area so long as he was on his way to go somewhere he was allowed to go.  [Napper] stated that he went to the area many times looking for his brother's sister.

On cross-examination, [Napper] conceded that he was in the area in October, November, and December.  When confronted with GPS records, [Napper] said that he did not know but may have been in the Southmore area on multiple occasions at times referred to in the records, with the last time being on December 10th.  He said that he was taken off GPS two days later. The prosecutor then asked, "I'm sure your parole officer will come in and tell us that you had permission to cruise whatever area you wanted, is that

12

correct?" [Napper] responded, "He probably won't. He won't tell you nothing else that was the truth."

[Napper] said that he told his parole officer that every Sunday from the middle of December through his arrest he was going to his friend Ben's on Sunday after church to work on his car. Later, the prosecutor asked, "Would you agree with me, Mr. Napper, that there were many occasions when you would deviate from your weekly schedule and do whatever you felt like doing?" [Napper] replied, "Well, what's your definition of deviate, going another direction, or is that what you're saying?" Upon further questioning, [Napper] agreed that he could go only to church or to Ben's on Sunday unless he told his parole officer ahead of time or there was an emergency.

[Napper] admitted to normally wearing a black baseball cap. When asked if he was taken from his residence on February 23rd, [Napper] responded, "I was kidnapped. They didn't have a warrant." With respect to whether there was body lotion in his bedroom, [Napper] said that his brother had a lot of stuff there and [Napper] "might have run in his room, grabbed it, put it in there." When asked who purchased the lotion, [Napper] said his brother's sister purchased it.

[Napper] admitted that he had a prior aggravated rape conviction dated August 25, 1981, but he claimed that he did not do it, that his attorney sold him out just like in the present case. [Napper] also admitted that he pled no contest to rape on September 4, 1981, but he claimed that he did not commit that crime either. When asked about a rape conviction on September 13, 1979, [Napper] claimed that he knew about only two rapes. When asked, "You remember being placed on probation one time before for rape?" [Napper] responded, "I was told that was dismissed or dropped." [Napper] admitted being convicted of indecent exposure on September 21, 1993. He claimed that he was sitting inside his car peeing in a can, and he said he did not think he was guilty of that offense either.

[Napper] acknowledged that, according to his electronic monitor, he arrived home at 3:07 p.m. on February 11, 2001. [Napper] protested that this effectively gave him an alibi because the victim was picked up at 3:10 p.m. [Napper] continued, "Parole officers know that. They won't tell you all of that. They told the news media that. I don't know why they won't tell the jury. That's my reason for testifying."

13

[Napper] also testified that the children did not describe his car: "It's not light green or red. My car is dark. It's gray. It's not even black." After admitting that several of E.T.'s descriptions matched [Napper]'s house, [Napper] said, "You didn't even put that in the indictment, that it was at my house. [E.T.] was taken to an apartment before he come to my house. Y'all ain't telling the jury that." [Napper] denied telling Butler that Ronnie spent the night at his house on February 11th.

*Ex parte Napper*, 322 S.W.3d at 213-16 (footnotes omitted). After hearing all of the evidence and argument by counsel, the jury found Napper guilty as charged and sentenced him to life imprisonment after finding that he had two prior felony convictions for sex offenses. *Id.* at 216.

## C.   Napper's Motion for New Trial

After the verdict and sentencing took place, Napper filed a notice of appeal and the trial court appointed different counsel, Bob Wicoff, to represent him. Before pursuing the appeal, Wicoff filed a motion for new trial, which faulted defense counsel Greenlee's strategy and his cross-examination of the HPD Crime Lab workers, specifically, Forensic Biologist Mary Childs-Henry and Chemist Joseph Chu:

> [Napper] gave notice of appeal, and the trial court appointed Bob Wicoff as appellate counsel. Wicoff filed a motion for new trial on [Napper]'s behalf, claiming that [Napper] was denied his right to represent himself at trial and that he received ineffective assistance of counsel.

> In connection with the motion, [Napper] submitted an unsworn declaration in compliance with the Texas Civil Practices and Remedies Code. Among other things, [Napper] pointed out that, although Greenlee elicited testimony from [Napper]'s parole officers that [Napper] was on electronic monitoring on February 11, 2001, Greenlee failed to elicit any testimony from them that the electronic monitoring confirmed [Napper]'s presence at home at 3:07 p.m. [Napper] stated that this was the reason that he had wanted to call these witnesses and that the failure to elicit this information forced him to take

the stand to testify about the matter.  Wicoff also submitted an affidavit from Butler, who expressed surprise at the fact that Greenlee failed to elicit this information from him — leading Butler to wonder why defense counsel chose to call him as a witness.

Wicoff also filed a motion to hire a DNA expert at county expense, which was granted. Wicoff later submitted an affidavit from Dr. Elizabeth Johnson, a forensic DNA expert who had developed some widely utilized DNA analysis techniques.

Dr. Johnson concluded that the testimony of Childs-Henry and Chu reflected "a lack of understanding" on their part "as to some of the fundamental aspects of body fluid identification, DNA extraction and typing as well as interpretation of results." Dr. Johnson further stated that she had reviewed numerous HPD Crime Lab cases in which these individuals performed analyses and she had detected serious errors in most of these cases, including the "unnecessary consumption of the evidence due to poor extraction protocols and techniques . . . and erroneous interpretation of data." She also stated that re-testing was a critical part of the evaluation of a criminal case involving DNA evidence and a necessary part of preparing an adequate defense.  "Because DNA evidence can have a tremendous impact on the outcome of a criminal case," she explained, "it is generally accepted in the relevant scientific community that re-testing needs to be performed whenever the evidence permits this."  Dr. Johnson cited a National Research Council (NRC) recommendation that "whenever feasible, investigative agencies and testing laboratories should provide for repeat testing."

Dr. Johnson further observed that, in this case, "as in many other cases I have reviewed involving the Houston PD lab, the lab apparently consumed all of the critical evidence . . . without notifying the prosecution of their intent to do so."  She explained that "[m]any laboratories" with which she was familiar would "not consume limited samples without notification so that defense counsel can have the opportunity to have the testing observed if duplicate testing is not possible."

Although re-testing was not possible, Dr. Johnson stated that a qualified expert should have reviewed the bench notes from the HPD Crime Lab to determine whether "an error in the analysis was documented or if the data obtained were interpreted and testified to correctly."  Dr. Johnson identified numerous questions that defense counsel should have asked Childs-Henry and Chu, including "what were the relative proportions of major and minor DNA

15

contributors and the corresponding peak heights" and whether there could be an "alternative interpretation of the mixed DNA profiles other than the approach utilized by Mr. Chu in which he determines the DNA profiles in the evidence based on his knowledge of the victim's and defendant's reference DNA profiles" and "whether it was appropriate of Mr. Chu to isolate the defendant's profile out of a mixture and report the frequency of the defendant's DNA profile rather than calculating the combined frequency of all possible donors to the mixed DNA profile obtained from the evidence." Based upon a study conducted in Connecticut, Dr. Johnson further explained that mixed samples were especially difficult to interpret and that "often an analyst will 'see' a particular individual's profile in a mixture by comparing it to a defendant's or victim's profile and perform a biased analysis. This type of biased analysis does not consider that the evidence profile in a mixed sample could be the result of the profiles of individuals other than the defendant and the victim." Dr. Johnson stated that this information was a subject that should have been brought out in cross-examination. Dr. Johnson also criticized defense counsel for failing to cross-examine the witnesses regarding the NRC recommendation or the practice of many laboratories to provide for repeat testing.

Dr. Johnson concluded that the expert testimony from Childs-Henry and Chu was "some of the most poorly presented and cross-examined testimony that I have ever reviewed." She found that Greenlee's "lack of knowledge . . . in the area of serology and DNA typing is apparent through his extremely cursory and superficial cross examination."

The State submitted an affidavit from Greenlee. After Greenlee became aware that there was no DNA left to test, and after consulting with other attorneys, he decided "that the only purpose that an expert would serve would be to review the procedures and methodologies used in the analysis by the State's experts." Greenlee believed that he "could effectively argue the unfairness of no sample being available to the defense to analyze" without the help of an expert. He further believed that, "if there were some issues with regard to methodologies and procedures," he "could get more mileage out of this on cross-examination." He also feared "the distinct possibility that our expert would confirm the propriety of the State's methodologies and procedures during the laboratory testing, thereby reinforcing the validity of the DNA results." Greenlee believed that he had effectively cross-examined the witnesses involved in the DNA collection and testing.

16

With respect to the testimony of the parole officers, Greenlee said that [Napper] believed that they would testify that there was not a valid parole warrant in effect at the time of his arrest. Greenlee had counseled against calling the parole officers, but [Napper] had insisted that they be called. Greenlee further stated that he did not spend much time on [Napper]'s time of arrival at home on February 11th because "it would not eliminate [Napper] as being capable of committing the offenses alleged." This was so because [Napper] was "in an area not too far from the kidnapping" that day and because intervening circumstances that took place prior to the police being called would have given [Napper] "more than enough time to travel from the kidnapping scene to his residence." Defense counsel believed that the weakest areas of the State's case were the DNA testing procedures and the victim's inability to identify [Napper] in the courtroom. Greenlee believed that, if [the] jury were inclined to find guilt despite those weaknesses in the State's case, then they were not going to find the time of [Napper]'s arrival at home to be significant.

Greenlee also stated that [Napper] was very demanding and uncooperative, and he repeatedly failed to take Greenlee's advice. Finally, Greenlee pointed out that he used an investigator, filed many motions on [Napper]'s behalf, reviewed reports, and spoke to witnesses.

*Ex parte Napper*, 322 S.W.3d at 216-18 (footnotes omitted). After reviewing all of the affidavits provided by the parties, and argument from counsel during a brief hearing, the trial court summarily denied the motion for new trial on January 18, 2002. *See Clerk's Record*, at 215; *Court Reporter's Record*, vol. 14, at 4.

### D. Napper's Direct Appeal

On direct appeal, Napper argued that he was denied effective assistance of counsel during the guilt/innocence phase of the trial because his counsel failed to conduct an adequate cross-examination of several key witnesses. An intermediate court of appeals rejected all of Napper's arguments and affirmed the conviction in an unpublished opinion. *Napper v. State*, Nos. 11-02-00017-CR & 11-02-00018-CR, 2003 WL 23163045 (Tex. App.

— Eastland Dec. 19, 2003) (per curiam).  Thereafter, the Texas Court of Criminal Appeals denied Napper's petition for discretionary review on July 2, 2004.  Napper did not pursue a petition for a writ of certiorari with the United States Supreme Court.

E.     **Napper's State Habeas Corpus Proceeding**

Napper challenged his conviction by filing a state habeas corpus application under Article 11.07 of the Texas Code of Criminal Procedure on September 24, 2004.  While Napper's habeas application was pending, his case was selected for further investigation, including additional DNA testing, after the local media reported widespread problems with the HPD Crime Lab.  After amending his application twice in 2008, Napper argued that he was entitled to relief from his conviction for the following reasons:  (1) the State engaged in bad faith by destroying the DNA evidence in his cases; (2) one of the State's witnesses (HPD Chemist Joseph Chu) presented false testimony that possibly constituted perjury; and (3) he was denied effective assistance of counsel at trial because his attorney did not hire a DNA expert or move for a continuance to conduct additional DNA testing of available evidence.

On April 16, 2009, the trial court held an evidentiary hearing on Napper's state habeas corpus application.  The trial court entered extensive findings and recommended that relief be granted on Napper's claim that HPD Crime Lab employees acted in bad faith by consuming all of the DNA evidence during the testing process.  *Ex parte Napper*, No. 15,601-03 at 768-71.  The Texas Court of Criminal Appeals rejected the trial court's findings and concluded that, despite problems with the HPD Crime Lab, Napper's claims were "without merit."  *Ex parte Napper*, 322 S.W.3d 202, 205 (Tex. Crim. App. 2010).  In

18

reaching that conclusion, the Texas Court of Criminal Appeals observed that all of his claims were undercut by the fact that additional DNA testing by two independent companies (ReliaGene and Orchid Cellmark) bolstered the results obtained at the HPD Crime Lab by linking Napper to the DNA recovered from sperm found on the victim's face.

The Texas Court of Criminal Appeals summarized the following facts about the additional DNA testing done in Napper's case and the "Bromwich Report," which documented the results of an investigation of HPD Crime Lab practices:

### 3. Additional Testing

In November of 2002, adverse publicity began to arise about the condition and practices of the HPD Crime Lab. Within a month, the acting Chief of Police commissioned an outside review of the lab's DNA/Serology section. Based upon a preliminary oral report of the auditors, HPD suspended the performance of all DNA analysis at the Crime Lab. In 2003, HPD and the Harris County District Attorney's Office began identifying cases in which some form of DNA analysis had been performed by the lab. "This process evolved into a long-term re-testing project coordinated among HPD, the District Attorney's Office, and outside DNA laboratories."

One of the cases identified in this process was [Napper]'s. The seemingly empty tubes that had contained DNA from the face swabs were forwarded by the HPD Crime Lab to ReliaGene Technologies. The lab also forwarded what purported to be reference samples from E.T. and [Napper]. ReliaGene used a buffer solution to re-suspend any DNA residue that might be left in the tubes, and it tested the DNA at fourteen genetic loci, including the original ten loci tested by Chu. Of the four tubes of DNA from the face swabs, only one tube — containing the epithelial fraction from one of the face swabs — produced any results.

In May of 2004, ReliaGene reported that the major component of the DNA was not consistent with E.T. or [Napper], while the minor component contained two weak alleles that were consistent with [Napper]. These two weak alleles were found in the additional loci not tested by Chu. After these results, it was determined that the tube purporting to contain E.T.'s reference

sample was not the correct tube.  On June 30, 2004, after a new reference sample was procured from E.T. and analyzed, ReliaGene concluded that the major component of the face-swab DNA was indeed consistent with E.T.'s DNA.  The conclusion with respect to the two weak alleles matching [Napper] was unchanged.  No other DNA alleles foreign to E.T. were detected in the sample.

In an affidavit later obtained in habeas corpus proceedings, Gina Pineda, Assistant Director at ReliaGene, explained that she did not believe that the DNA extracts received by ReliaGene were quantitatively the same as those tested by the HPD Crime Lab.  Consequently, she would expect ReliaGene to detect fewer alleles in its analysis, but for the results to remain consistent with what the HPD Crime Lab had found.  Her examination of the data indicated that, indeed, the results obtained by the two testing laboratories were "not discrepant."  She also expected that, if a third round of testing were performed, there would be a further progressive loss of alleles.  Some of the victim's alleles might also become lost and "some allele drop-in may also be observed."

In an August 2004 newspaper article, assistant district attorney Marie Munier was quoted as saying about the ReliaGene results, "You can't even do a statistical analysis (on the probability that the DNA was Napper's).  I don't know what it would be, but it wouldn't be very much."

In 2005, during the instant habeas proceedings, the parties agreed to more testing, by Orchid Cellmark. They acknowledged in writing that the testing was expected to consume all of the evidence and agreed to waive the opportunity to have a representative observe or participate in the testing.

In June of 2005, Orchid Cellmark reported that it was able to obtain results for the face-swab tubes containing the epithelial fractions of DNA but was unable to obtain results for the tubes containing the sperm fractions.  The samples were analyzed at sixteen different loci, including the ten loci tested by Chu and the four additional loci tested by ReliaGene.  The samples for both epithelial-fraction tubes were mixtures.

For one of the epithelial samples, Orchid Cellmark determined that the major profile matched the victim, and the suspect could not be excluded as a possible donor of the minor alleles in the mixture.  Four alleles foreign to the victim were found (across four different loci), all of which matched [Napper]'s DNA profile.  One of these alleles was found at a locus that had been tested by both HPD and ReliaGene but had not previously been found there.  One of the

alleles was confirmed at one of the new loci that had been tested by ReliaGene. The other two alleles were found at new loci tested only by Orchid Cellmark.

Orchid Cellmark determined that the other epithelial sample was a mixture of DNA from the victim and an unknown individual.  Five alleles foreign to both the victim and [Napper] were found, and two loci yielded inconclusive results.  In subsequent testing, Orchid Cellmark was able to exclude as possible contributors to the foreign alleles A.G. Riddle, C. West, J. Chu, J.W. Belk, L.R. Verbitskey, M. Childs-Henry, and R. Hilleman.

Orchid Cellmark provided statistical frequency calculations for the epithelial sample that contained the four alleles that matched [Napper]'s DNA profile. According to Orchid Cellmark, the approximate frequencies for unrelated individuals for all possible types included in the mixture, making no assumptions regarding the number of DNA sources, are 1 in 255 for African–Americans, 1 in 3,427 for Caucasians, and 1 in 585 for Hispanics.

### 4. Bromwich Report

As a result of problems discovered with the HPD Crime Lab, a team headed by Michael R. Bromwich was chosen to further investigate and evaluate the Crime Lab's practices, both past and present. The report, published on June 13, 2007, contained numerous scathing criticisms of the Crime Lab's serology/DNA section. "On the whole," the serology/DNA section's "work did not meet the generally accepted forensic science principles that existed at the time and posed major risks of contributing to miscarriages of justice in extremely significant cases."

Bromwich attributed this failure to budgetary problems, incompetent leadership, and lack of training for the DNA analysts. "[U]ntil the public crisis engulfed the Crime Lab, it was never provided adequate financial support to hire and train the number of criminalists necessary to handle the Lab's ever-increasing workload."  The DNA section was in "shambles — plagued by a leaky roof, operating for years without a line supervisor, overseen by a technical leader who had no personal experience performing DNA analysis and who lacked the qualifications required under the applicable Federal Bureau of Investigation ('FBI') standards, [and] staffed by underpaid and undertrained analysts."  Training was one of the first areas in which funding was cut when the HPD Crime Lab's budget became tight.  The lab was populated by civilian, as opposed to law enforcement, employees, and as such, was marginalized within HPD.  Until the 2002 audit, the HPD Crime Lab did

not submit to reviews by outside agencies and never sought to achieve accreditation.  As a result, HPD's analysts became isolated from the rest of the forensic science community.  Although the person with supervisory control over the DNA section certified that internal audits conforming to FBI quality assurance standards found that those standards were met, the outside audit found to the contrary.

Bromwich characterized the HPD DNA analysts as "woefully undertrained."  "The problems we observed in the historical DNA cases," he further explained, "are not attributable to individual rogue analysts who departed from the Crime Lab's approved practices.  On the contrary, the widespread and serious deficiencies in the historical Crime Lab were consistent with the Crime Lab's accepted and understood practices." Consequently, "[f]lawed practices and embedded misunderstandings  .  .  . became accepted by analysts within the DNA/Serology Section as the correct way of doing things. These misunderstandings infected the work of the Section's analysts from the analysis through the trial testimony."  Bromwich found "the same types of major issues across all the Crime Lab's DNA work, regardless of the analyst or the DNA typing system used."

One of the cases that Bromwich reviewed was [Napper]'s. Bromwich criticized Childs-Henry for failing to properly document the procedures she used and for failing to use some of the more definitive procedures for detecting and confirming the presence of semen.  With respect to Chu's testing, Bromwich found that the "original DNA testing appears to have generated good quality and clear results from potentially very difficult forensic evidence samples."  The "overall assessment" of Chu's testing was that "he developed clean, interpretable profiles from the four evidence samples he tested."

But, according to Bromwich, [Napper]'s case "illustrates two significant problems with the Lab's historical DNA work. First, the Crime Lab analysts utilized all of the readily testable sample in this case," and second, Chu used an inappropriate statistical analysis of the random match probability. Regarding the first problem, Bromwich found that "it was unnecessary and inappropriate for Mr. Chu to have tested the extracts from both swabs, thereby consuming the available sample in this case."  Although Chu stated in an affidavit in the instant habeas proceedings that he did not "consume all of the extract in this case out of carelessness or out of a desire to prevent additional testing," Bromwich concluded that "there was no need, and it was a mistake, for him to consume both of the redundant 'face-cheek' swabs."  Doing so was "the product of very poor laboratory practice."  This "misstep" was

compounded by the fact that Childs-Henry had "discarded the tubes containing the raw evidence (the swabs) after she performed the DNA extractions." And while "outside laboratories have been able to obtain some results" — "mixed results" — from testing the unseen residue in the tubes, those results "do not approach the strength" of "Chu's original results."  Notably, the Bromwich Report observed, "Neither laboratory has been able to confirm the alleles consistent with Mr. Napper's DNA profile that Mr. Chu detected in the sperm fractions of each of the swabs, which captured most of the consistency between evidence profiles and Mr. Napper's DNA profiles."

Turning to Chu's statistical analysis, Bromwich initially criticized statements made by Chu in a March 30, 2001 report.  There, Chu characterized the DNA material as a "mixture" consistent with the victim and with [Napper]. Chu went on to state, "Given the population on the face of the earth and eliminating the probability of identical twins, the DNA profile statistically matches only Lawrence Napper."  Bromwich criticized these statements as "contradictory" and called Chu's statistical statement "incorrect and misleading."

Further, Bromwich's examination of Chu's file revealed that Chu based his statistical calculation of the random match probability upon [Napper]'s known profile, "which was the usual — and extremely flawed — practice in the Crime Lab."  In another portion of his report, Bromwich explained that, while calculating the random match probability of a single DNA profile was "relatively simple and straightforward" and can "provide the most discriminating information about whether a particular individual could be the source of the biological evidence," the same could not be said of a mixed sample containing DNA from more than one person.  When a DNA profile contains DNA from more than one person, "it is much more difficult to provide compelling statistical evidence that a particular person's DNA was found in an evidence sample."  Random match probabilities related to a mixture "may result in frequency estimates that indicate that a relatively large proportion of the human population could have contributed to the biological evidence."  A frequency estimate based upon a suspect's known reference sample "is completely irrelevant to the strength of the DNA evidence when the DNA profile is a mixture."  Nevertheless, despite the inappropriateness of calculating a random match probability using a defendant's known profile, "the Crime Lab virtually always calculated its reported frequency estimates" in this fashion.

When setting out an allelic table, Bromwich bolded the alleles that were unique to [Napper]'s profile (matching [Napper] but foreign to the victim), indicating that it was those unique alleles from which a random match probability must be calculated. Based on Chu's STR data, Bromwich calculated the accurate random match probability as "1 in 232,000 in the African American population, 1 in 1,920,000 in the Caucasian population, and 1 in 7,430,000 in the Hispanic population." He characterized these statistics as "relatively strong results given the nature of the sample in this case," but "a far cry from the sole source, unique match that Mr. Chu reported."

*Ex parte Napper*, 322 S.W.3d at 219-24 (footnotes omitted).[3]  Finally, the Texas Court of Criminal appeals summarized the proceedings in connection with Napper's state application for a writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure, which included affidavits and a live evidentiary hearing before the trial court:

### 5. Habeas

Wicoff filed a habeas application on [Napper]'s behalf. In addition to the evidence above, the habeas court obtained affidavits from Glaeser, Greenlee, Childs-Henry, Chu, and Johnson. [Napper] submitted affidavits from two attorneys — [David] Cunningham and [Christopher] Downey. The court conducted an evidentiary hearing, at which Greenlee testified. And the habeas court received various pieces of documentary evidence.

The facts conveyed by Glaeser's affidavit have already been discussed.

In his affidavit, Greenlee stated that [Napper]'s response to the criminal charges "was an adamant denial of the charge." Before trial, Greenlee believed there would be three main pieces of evidence at trial: DNA evidence, evidence relating to the bottle of orange lotion, and evidence relating to [Napper]'s electronic monitoring. Greenlee believed he had effectively shown on cross-examination that there was not a clear set of procedures, methodologies, and practices regarding how the DNA material was analyzed.

---

[3]     The footnotes omitted from this section consisted mainly of cites to the "Bromwich Report." *See* Michael R. Bromwich, Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room (June 13, 2007).

In her affidavit, Childs-Henry stated that she "did not observe the vials of extract after they were transferred to Chu" and had "no way of knowing what amount of liquid, if any, actually remained in the vials once Chu had completed his analysis." Realizing that this statement conflicted with her trial testimony, Childs-Henry explained that she had trained under the RFLP variant of DNA analysis and was unfamiliar with the STR procedure at the time of trial. She had just assumed there would be sample left based on her RFLP training because there was generally sample left after RFLP testing. After reviewing her trial testimony, Childs-Henry stated that she realized that the defense attorney was asking whether she knew for a fact that liquid DNA extract still existed and that, in reading over her answers, she could only assume that, while she was being cross-examined by defense counsel, she "did not understand the intent behind his questioning." She further stated that it was not her intent to be misleading or untruthful but that her statement that there was DNA sample left was "unintentionally incorrect."

Chu's affidavit contained his statement, recounted above, that his consumption of all of the DNA material was not from carelessness or a desire to prevent additional testing. He said he did not expect to be able to develop a profile from the sample because the concentration of DNA was so low. He also stated that in such cases, it is not uncommon to consume all of the liquid extract in testing. He also said that, when asked whether there was any DNA left to test, he interpreted the question, under "the common language and words of art used in our lab," to mean whether there was any liquid extract remaining — not whether it was possible to obtain DNA test results from residue that might have been left in the tubes. His statement to Glaeser and his subsequent testimony at trial accorded with that understanding and was not an attempt to hide or withhold anything from the defense.

Dr. Johnson's affidavit responded to the DNA test results from ReliaGene. She believed that the two alleles that matched [Napper]'s DNA had to be analyzed separately for the purpose of establishing a random match probability. One of the alleles was present in 14.5 percent of African–Americans, 16.5 percent of Caucasians, and 10.29 percent of Hispanics. The other allele was present in 30 percent of African–Americans, 32.5 percent of Caucasians, and 39.23 percent of Hispanics. She also expressed dismay at HPD's initial error in forwarding an incorrect reference sample to ReliaGene. "This type of serious error is typical of the work performed at the HPD lab based on my review of many cases," she said, "and it calls into question the validity and reliability of re-testing any DNA that was originally extracted by the HPD lab." She stated that it was "highly likely

given the sloppy work performed by HPD, that even if the foreign alleles detected in the face swab extract originated from Mr. Napper's DNA, that it could be a result of contamination within the HPD lab."

Dr. Johnson also criticized the statistical frequency estimate offered by Chu at trial (that the DNA from the swabs statistically matched [Napper]'s profile). She contended that the estimate was "completely unsupported scientifically" and was "patently false." She further stated that a "mixture of DNA cannot possibly statistically match only one person" and "attempts to discern the individual profiles in a mixture of DNA is very difficult."

* * * *

At the evidentiary hearing, Greenlee testified that the State had a compelling case without the DNA evidence. Greenlee saw three "linkages" between [Napper] and the crime: (1) DNA, (2) E.T.'s description of [Napper]'s house, "which was on point," and (3) the "unique orange lotion" found in the house. Nevertheless, Napper's defense was that he did not do it.

When asked about his prior experience, Greenlee acknowledged that he had no degree in the field of forensic training and that, before [Napper]'s trial, he had never taken any continuing legal education classes on DNA, had never presented a DNA expert as a witness, and had never cross-examined a DNA expert. When asked whether he had ever used a consulting expert, Greenlee said, "Well, I don't differentiate between consulting and using them as an expert witness. If I'm going to call somebody as an expert witness, I'm going to consult them . . . . From a semantic standpoint, it seems to me they're the same kind of person." When asked, "[I]f the State were relying on the testimony of an expert in an area that you were totally unfamiliar with, might you call someone to educate yourself through that expert so that you could more effectively handle the State's case yourself," Greenlee responded, "Not necessarily, because I can read." After Greenlee had discussed securing literature on fingerprint analysis as an example of self-teaching, Wicoff asked if DNA was more complex than fingerprints. Greenlee answered, "I'm not equipped to make that distinction."

When asked if he thought he could obtain "lab notes or worksheets or electronic data from DNA testing" through discovery, defense counsel replied that he believed that worksheets and lab notes would be protected by the work-product privilege, but electronic data should be available. When asked if he received an electropherogram, defense counsel said, "No," but he "saw

a breakout of all of the alleles." When asked if he saw an allelic table, defense counsel said, "I believe I did," but then stated, "it's been eight years," when Wicoff pointed out that "HPD doesn't do allelic tables."

Greenlee also stated that he did not think he needed prior training with respect to reading the DNA information because it was "relatively straightforward." When asked whether a testifying expert would have enhanced his strategy of emphasizing the unfairness of not having DNA available for testing by the defense, Greenlee said, "Not necessarily," because the expert testimony might have been unfavorable, and he did not have the benefit of hindsight. "Because," Wicoff asked, "you never checked with a consulting expert?" Greenlee said that he "didn't feel the need to."

When asked why he did not obtain testing after Childs-Henry testified that some DNA sample remained, Greenlee said that they later learned that Childs-Henry "was simply mistaken." When asked what he understood by the statement that no material was left for analysis, Greenlee replied, "That whatever material was taken from the little boy . . . there was nothing left for me to conduct an independent analysis on."

Greenlee also testified that he thought the defense was helped by Childs-Henry's testimony that a "sloppy chemist" would consume the entire sample. And he testified that the defense was seriously hurt by [Napper]'s own testimony, that the damage caused by that outweighed the DNA evidence and was the "deciding factor" in the case.

The habeas record also contains documents from the FBI and the National Research Council (NRC) regarding standards for DNA testing. In the FBI document, Standard 7.2 states: "Where possible, the laboratory should retain or return a portion of the evidence sample or extract." The NRC's Recommendation 3.3 states:

> Whenever feasible, forensic samples should be divided into two or more parts at the earliest practicable stage and the unused parts retained to permit additional tests. The used and saved portions should be stored and handled separately. Any additional tests should be performed independently of the first by personnel not involved in the first test and preferably in a different laboratory.

> In the commentary, the NRC states, "We recognize that no amount of care and proficiency testing can eliminate the possibility of error. However, duplicate tests, performed as independently as possible, can reduce the risk of error enormously. The best protection that an innocent suspect has against an error that could lead to a false conviction is the opportunity for an independent retest."

*Ex parte Napper*, 322 S.W.3d at 205-27.  In light of the inculpatory nature of the independent DNA test results, the Texas Court of Criminal Appeals hesitated to find that the evidence at issue was potentially useful to Napper and concluded that, while mistakes were made during the testing process, there was no proof that evidence was destroyed with "bad faith."  *Id.* at 239-40.  The Court of Criminal Appeals concluded further that there was no evidence to support Napper's claim that Chu knew his estimate was wrong or that the State made knowing use of false testimony.  *See id.* at 244.  In addition, the Court of Criminal Appeals found that, while Napper's defense counsel may have been deficient for failing to hire a DNA expert to assist him at trial, Napper was not prejudiced by his counsel's performance because there was no reasonable probability of a different result.  *See id.* at 249-51. Accordingly, the Texas Court of Criminal Appeals denied all of Napper's claims.

### F.    Napper's Federal Habeas Corpus Proceedings

On September 29, 2010, which is the same day that the Texas Court of Criminal Appeals denied Napper's state habeas corpus application, Napper's appellate and state habeas attorney, Bob Wicoff, filed a skeletal petition for federal habeas corpus relief under 28 U.S.C. § 2254.  In that federal petition, Napper repeated the three substantive claims that were raised and rejected by the Texas Court of Criminal Appeals on state habeas corpus

review.  After Wicoff requested permission to withdraw, the Court appointed a new attorney to represent Napper.  Napper filed an amended petition on September 22, 2011.  In addition to the claims that Napper litigated on state habeas corpus review, the amended petition raises four new allegations of ineffective-assistance concerning his trial attorney, Steven Greenlee.  These new allegations fault Napper's defense counsel for the following: (1) failing file a motion to suppress the victim's pretrial identification; (2) failing to adequately prepare Napper to testify at trial; and (3) failing to present an opening statement.  Napper argues further, for the first time, that he is entitled to relief because the "cumulative effect" of Greenlee's errors "undermines confidence in the verdict."

The respondent has filed a motion for summary judgment arguing that the new claims raised by Napper in his amended petition are untimely and barred from review by the one-year statute of limitations because the new allegations do not relate back to the claims raised in his initial petition.[4]  The respondent argues that all of Napper's claims fail as a matter of law and do not merit habeas corpus relief.  The parties' contentions are discussed further below under the governing federal habeas corpus statutes, beginning with the one-year statute of limitations on review.

## II.      THE ONE-YEAR STATUTE OF LIMITATIONS

---

[4]      The respondent argues further, in the alternative, that the new claims raised in Napper's Amended Petition are unexhausted and barred from review by the doctrine of procedural default.  The Court does not reach this argument for reasons set forth in more detail below because, in addition to being untimely, the proposed new claims are without merit.

This federal habeas corpus proceeding is governed by the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). According to the AEDPA, all federal habeas corpus petitions filed after April 24, 1996, are subject to a one-year limitations period found in 28 U.S.C. § 2244(d)(1). The Supreme Court has recognized that "AEDPA's purpose [is] to further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Duncan v. Walker*, 533 U.S. 167, 178 (2001). The statute of limitations found in § 2244(d)(1) "reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review." *Duncan*, 533 U.S. at 179. Because the pending petition was filed well after April 24, 1996, the one-year limitations period clearly applies. *See Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).

Napper challenges a state court conviction that was entered in 2001. Thus, the statute of limitations for federal habeas corpus review began to run at "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). As noted above, Napper's conviction was affirmed on December 13, 2003, and the Texas Court of Criminal Appeals refused his petition for discretionary review on July 2, 2003. Although Napper did not appeal further by filing a petition for a writ of certiorari, his time to do so expired 90 days later on September 30, 2003. That date triggered the one-year statute of limitations.

It is undisputed that, six days before the one-year statute of limitations could expire, Napper initiated state habeas corpus proceedings under Article 11.07 of the Texas Code of Criminal Procedure on September 24, 2004.  Under 28 U.S.C. § 2244(d)(2), the time during which a "properly filed application for [s]tate post-conviction or other collateral review" is pending shall not be counted toward the limitations period.  The Texas Court of Criminal Appeals denied relief approximately six years later on September 29, 2010.  Napper's state habeas corpus proceedings were pending for a total of 2199 days.  Accordingly, that state proceeding extended Napper's deadline to pursue habeas corpus relief in federal court until October 7, 2010.

The respondent does not dispute that the skeletal habeas corpus petition filed by Napper on September 29, 2010, is within the statute of limitations.  However, the respondent maintains that the amended petition filed on September 22, 2011, which added four new claims for relief, is not timely.  The respondent argues that the four new claims raised in the amended petition are barred by the statute of limitations because those claims are not sufficiently related to the allegations found in the skeletal pleading.  Napper does not respond to this argument or attempt to show that the claims are related.

The Supreme Court has held that, for a new claim to relate back to an original pleading for purposes of the AEDPA statute of limitations, the claim cannot assert "a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth."  *Mayle v. Felix*, 545 U.S. 644, 650 (2005).  As outlined above, the state habeas proceeding and skeletal petition filed originally in federal court focused on three

31

claims concerning the DNA evidence and forensic testimony presented at trial. The proposed new claims, which allege ineffective assistance of counsel in connection with other issues, are factually distinct from those in the original pleadings. Because the new claims raised in Napper's amended petition differ factually from the grounds raised in his original petition, the new claims are barred by the statute of limitations. Napper may not proceed with those claims unless he establishes that an exception applies.

Napper does not attempt satisfy any recognized exception. In that respect, Napper does not demonstrate that he was subject to state action that impeded him from presenting his new claims in a timely manner. *See* 28 U.S.C. § 2244(d)(1)(B). There is no showing of a newly recognized constitutional right upon which the new claims are based, and there is no factual predicate for the claims that could not have been discovered previously if the petitioner had acted with due diligence. *See* 28 U.S.C. § 2244(d)(1)(C), (D). Because Napper makes no effort to show that he was prevented from filing a timely petition, equitable tolling is not available. *See, e.g., Ott v. Johnson*, 192 F.3d 510, 514 (5th Cir. 1999). Based on this record, Napper has not established a valid basis to extend the deadline for federal review of his new claims. Accordingly, the above-referenced new claims found in the amended petition are barred from review by the governing one-year limitations period. Alternatively, the new claims fail for other reasons discussed further below.

## III. NAPPER'S CLAIMS DO NOT MERIT RELIEF

The respondent moves for summary judgment on the grounds that all of Napper's claims are without merit. Motions for summary judgment are typically governed by Rule 56

of the Federal Rules of Civil Procedure.  In this instance, the respondent's summary-judgment motion must be determined in compliance with the federal habeas corpus statutes. *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002); *see also Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  Federal habeas corpus proceedings filed after April 24, 1996 are governed by provisions of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Several of Napper's claims were addressed at length and rejected by the Texas Court of Criminal Appeals.  To the extent that the petitioner's claims were "adjudicated on the merits" in state court, the AEDPA standard found at 28 U.S.C. § 2254(d) applies.[5]

Claims presenting pure questions of law and mixed questions of law and fact are governed by 28 U.S.C. § 2254(d)(1), which precludes habeas relief unless a petitioner demonstrates that the state court's decision to deny a claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1); *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A state court's decision is deemed contrary to clearly established federal law

---

[5]     There are additional limitations on federal habeas review.  Pre-AEDPA precedent forecloses habeas corpus relief if any of the following circumstances are present: (1) the claim is barred as a consequence of the petitioner's failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) the claim seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) the claim asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000). A state court unreasonably applies clearly established precedent if it identifies the correct governing legal principle but unreasonably applies that principle to the facts of the case. *See Brown v. Payton*, 544 U.S. 133, 141 (2005). Under this standard, an unreasonable application is more than merely incorrect or erroneous; rather, the state court's application of clearly established law must be "objectively unreasonable." *Williams*, 529 U.S. at 409.

The Supreme Court has clarified that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398 (2011). Where applicable, a state court's findings of fact "are 'presumed to be correct' unless the habeas petitioner rebuts the presumption through 'clear and convincing evidence.'" *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (quoting 28 U.S.C. § 2254(e)(1)). This presumption extends not only to express findings of fact, but to the implicit findings of the state court as well. *See Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citations omitted). Where pure questions of fact are concerned, a petitioner is not entitled to relief unless he demonstrates that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); *see also Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

As this deferential standard reflects, the AEDPA has "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (quotation omitted).  In that respect, the AEDPA standard "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state court proceedings." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786 (2011).  The Supreme Court has underscored the extent of this deferential standard:

> [28 U.S.C. § 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining [a writ of] habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. at 786-87.  This deferential AEDPA standard of review applies even where the state court fails to cite applicable Supreme Court precedent or fails to explain its decision.  *See Early v. Packer*, 537 U.S. 3, 7 (2002); *see also Richter*, 131 S. Ct. at 785 (confirming that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'").  The petitioner's claims are examined below under the applicable legal standard.

### A.      The *Youngblood* Claim: Destruction of Potentially Useful Evidence

Napper contends that the State violated his right to due process because two HPD Crime Lab workers (Joseph Chu and Mary Childs-Henry) consumed or destroyed "potentially useful" DNA evidence without affording the defense an opportunity to conduct independent testing.  He insists, therefore, that his conviction violates due process under the Supreme Court's holding in *Arizona v. Youngblood*, 488 U.S. 51 (1988).  Noting that the Texas Court of Criminal Appeals rejected this claim after thorough review, the respondent maintains that Napper is not entitled to relief under the deferential AEDPA standard because he does not demonstrate that the state court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent.

The Supreme Court has held that the State violates a defendant's right to due process if: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).  If the exculpatory value of the evidence is undetermined, but may be "potentially useful" to the defense, then a defendant must show that the government acted with bad faith in destroying the evidence. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1994).  Thus, the failure to preserve potentially useful evidence "does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'" *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (per curiam).

Napper's claim concerning the destruction of potentially useful evidence was addressed at length on state habeas corpus review, where the trial court initially

recommended granting relief.  *See Ex parte Napper*, No. 15,601-03 at 768-71.  The trial court found that HPD Crime Lab employees should have been aware of new legislation on the preservation of evidence containing biological material, TEX. CODE CRIM. PROC. art. 38.43, as well as standards governing forensic crime laboratories adopted by the Federal Bureau of Investigation and National Research Council.  *See id.* at 770.  The Texas Court of Criminal Appeals briefly summarized the trial court's findings, which concluded that the DNA material in Napper's case constituted "potentially useful evidence" that "might have" exonerated Napper and that, by destroying this evidence unnecessarily, the lab workers acted in bad faith:

> [Napper] contends that Chu and Childs-Henry "intentionally, recklessly, and in bad faith consumed and destroyed available evidence."  He notes the Bromwich Report's criticism of Chu for effectively consuming the entire sample and of Childs-Henry for discarding the original swabs.

> The habeas court recommends that relief be granted on this ground under *Arizona v. Youngblood*, [488 U.S. 51(1988)] and *Illinois v. Fisher*, [540 U.S. 544 (2004)].  Under those cases, the court concludes that a defendant is entitled to relief if it is shown that the State acted in bad faith in destroying potentially useful evidence.

> The habeas court concludes that the DNA material in this case constituted "potentially useful evidence" because the DNA test results might have exonerated [Napper]. Citing Professors Dix and Dawson, the court says that showing bad faith requires establishing that "law enforcement officials were actually aware their action or inaction would result in the loss of what they recognized would be evidence."  [*See* GEORGE E. DIX AND ROBERT O. DAWSON, 42 TEXAS PRACTICE, 2nd ed., § 22.63 (2001).]  Under this standard, the court concludes that the lab workers acted in bad faith.

*Ex parte Napper*, 322 S.W.3d at 227. The Texas Court of Criminal Appeals, which is the last state court to address Napper's claim, disagreed, taking particular issue with the trial court's definition of bad faith for purposes of a destruction-of-evidence claim under *Youngblood*.

In rejecting the trial court's recommendation, the Texas Court of Criminal Appeals engaged in a more elaborate discussion of the Supreme Court precedent that governs destruction-of-evidence claims and the required element of bad faith, which is distinguishable from destruction done in good faith or negligence by the police:

> In *Youngblood*, the defendant complained about the State of Arizona's failure to preserve semen samples from the victim's body and clothing. [448 U.S. at 52.] Noting that the State's good or bad faith is irrelevant when the State fails to disclose exculpatory evidence, the Supreme Court nevertheless held that a different standard applies "when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [*Id*. at 57.] Quoting *California v. Trombetta*, [467 U.S. 479 (1984)] the Supreme Court concluded that different treatment was justified in part because "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Youngblood*, [488 U.S. at 57-58 (quoting *Trombetta*, 467 U.S. at 486).] Consequently, when the destruction of potentially useful evidence is at issue, the defendant must show "bad faith" on the part of the State in destroying the evidence in order to show a violation of due process. [*Id*. at 58.] This rule confines the police's obligation to preserve evidence "to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." [*Id.*] Turning to the facts of the case, the Supreme Court explained that the "failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent." [*Id.*] Because there was no suggestion of bad faith on the part of the police, there was no violation of due process. [*Id.*]

> The Supreme Court noted two distinctions between the case before it and *Trombetta*: "In the present case, the likelihood that the preserved materials

38

would have enabled the defendant to exonerate himself appears to be greater than it was in *Trombetta*, but here, unlike in *Trombetta*, the State did not attempt to make any use of the materials in its own case in chief." [*Id*. at 56.] In a footnote to that sentence, the Supreme Court extensively discussed the requirements of *Trombetta* and then stated: "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." [*Id*. at 56 n. *.]

In *Trombetta*, the defendant complained about the failure to preserve breath samples for re-testing by the defense after the samples were obtained by a breathalyzer machine and produced inculpatory results. [*See* 467 U.S. at 487-90.] The Supreme Court rejected the defendant's claim for three reasons. First, the authorities did not destroy the breath samples "in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland*, [373 U.S. 83 (1963)] and its progeny" but acted "in good faith and in accord with the normal practice." [*Trombetta*, 467 U.S. at 488.] The Court observed that the record contained no allegation "of official animus towards the respondents or a conscious effort to suppress exculpatory evidence." [*Id.*] Second, the evidence did not have exculpatory value that was apparent before it was destroyed. [*Id*. at 489.] "Although preservation of breath samples might conceivably have contributed to respondents' defenses, a dispassionate review of the Intoxilyzer and the California testing procedures can only lead one to conclude that the chances are extremely low that preserved samples would have been exculpatory." [*Id.*] Third, the evidence was not of "such a nature that the defendant would have been unable to obtain comparable evidence by other reasonably available means." [*Id.*] There were a limited number of ways in which the machine could malfunction — faulty calibration, extraneous interference with machine measurements, and operator error — and the defendants could raise these issues on cross-examination after examining the machine and the weekly calibration results. [*Id*. at 490.]

After *Youngblood*, the Supreme Court decided *Fisher*, which involved a complaint about the destruction of a substance alleged to be cocaine. [*Fisher*, 540 U.S. at 545.] Four tests by a police crime lab confirmed that the substance was cocaine. [*Id.*] The Court held that the substance "was plainly the sort of 'potentially useful evidence' referred to in *Youngblood*, not the material exculpatory evidence addressed in *Brady*" because "[a]t most, respondent could hope that, had the evidence been preserved, a *fifth* test conducted on the substance would have exonerated him." [*Id*. at 548 (emphasis in original).] The defendant did not show bad faith because "police testing indicated that the

39

chemical makeup of the substance inculpated, not exculpated, respondent" and "it is undisputed that police acted in 'good faith and in accord with their normal practice'" [*Id.*]  Reversing an Illinois appellate court, the Supreme Court held that the existence of a pending discovery request does not eliminate the necessity of showing bad faith. [*Id.*]

*Ex parte Napper*, 322 S.W.3d at 230-32.  In setting out this legal standard, the Texas Court of Criminal Appeals observed that none of the Supreme Court's cases provide "a stand-alone definition of the term potentially useful evidence."  *Id.* at 232.  The Court of Criminal Appeals questioned, in particular, whether potentially useful evidence was broadly defined to include evidence of the sort at issue in Napper's case, which appeared to have little value to his defense because of its inculpatory nature:

> [Napper]'s reliance on *Fisher* for the proposition that the term "potentially useful evidence" is broad is somewhat misplaced. None of the Supreme Court's cases, including *Fisher*, purport to provide a stand-alone definition of the term "potentially useful evidence."  Rather, the Court's cases appear to contrast evidence that is at best "potentially useful" with "material, exculpatory" evidence under *Brady*. When evidence is at best "potentially useful," then the defendant must at least show "bad faith." That does not really answer the question of when the potential exculpatory value of evidence is so attenuated that even a showing of bad faith will not afford a basis for relief.

> Professors Dix and Dawson suggest that the "possibility" of exculpation is not enough — that the defendant "must apparently show at least a substantial or considerable likelihood the evidence, if preserved, would have tended to show his innocence." [DIX AND DAWSON, § 22.64.] A few isolated cases from other jurisdictions have held that evidence is not even potentially useful when the potential exculpatory value of the evidence is "mere speculation," when the allegedly exculpatory fact was legally irrelevant to the crime charged, when the allegedly exculpatory fact would not really provide an exculpatory inference, when the exculpatory relevance of the evidence was not shown, when the chance that the evidence would exonerate the defendant was "virtually nil," or when other evidence conclusively established that testing would not yield an exculpatory result.

*Ex parte Napper*, 322 S.W.3d at 231.  The Texas Court of Criminal Appeals then conducted

an extensive survey of state and federal decisions to determine the meaning of bad faith in

this context:

> More effort has been expended trying to determine the meaning of "bad faith."  As Dix and Dawson acknowledge, "Precisely what constitutes 'bad faith' is not clear."  The suggestion by the habeas court in this case that the test for bad faith is whether the officials "were actually aware their action . . . would result in the loss of . . . evidence" miscomprehends [sic] Professors Dix and Dawson's thoughtful discussion.  Dix and Dawson state that a defendant "must apparently prove at least that law enforcement officials were actually aware their action or inaction would result in the loss of what they recognized would be evidence."  They do not say that such awareness is necessarily enough.  If awareness that evidence would be destroyed were enough, by itself, to constitute bad faith, then officials could never conduct a test that would consume all of the evidence, even if doing so were necessary to achieve probative results. Dix and Dawson suggest that *Trombetta* articulates at least two situations in which bad faith would be shown: when the prosecution acts with "official animus" toward the defendants or acts with "a conscious effort to suppress exculpatory evidence."

> A review of federal circuit courts and state courts of last resort in other jurisdictions reveals that they generally require a showing along those two lines. Some courts have expressly adopted the *Trombetta* formulation as the definitive test of bad faith.  Other courts have focused on one or both of the *Trombetta* situations, characterizing bad faith as involving improper motivation or malice, or defining bad faith as an intent to deprive the defendant of access to (exculpatory or potentially exculpatory) evidence. Various jurisdictions have also indicated that bad faith is not established by a mere showing that the government agent was grossly negligent, engaged in intentional conduct, did not follow proper procedures, exercised poor judgment, or performed sloppy work.  Bad faith was held to be absent when government agents did not suspect that the evidence they destroyed was or might have been exculpatory, when destruction of the evidence was due to lack of training, or ignorance of a recently passed law, when the government agent believed his tactics were lawful, or when the evidence was destroyed before the government agent was notified that it might have exculpatory value, before the defendant was a suspect, or before the defendant expressed a desire to have the evidence preserved.  Knowing the evidence is obviously relevant to, or

even determinative of, guilt or innocence has been held to be insufficient to show bad faith.  The government's ability to preserve the evidence has also been held not to be dispositive.

But courts have found bad faith where government agents hid or concealed the evidence until it was destroyed, destroyed the evidence after being expressly notified by the defense of its potential exculpatory value, destroyed the evidence after a dismissal of the case (and then re-instituted proceedings), or where government agents refused to show up in court for an inquiry into their good or bad faith.  The Tenth Circuit has formulated a five-factor test that considers whether: (1) the government received explicit notice of the evidence's potentially exculpatory nature, (2) the claim was backed up with objective, independent evidence rather than being conclusory, (3) the evidence was in the government's control at the time of notice, (4) the evidence was central to the case, and (5) there is any innocent explanation for the evidence's destruction.

Several courts have explained *Youngblood*'s "bad faith" requirement as substituting for *Brady*'s requirement that evidence be exculpatory.  Essentially, an inference that the evidence was probably exculpatory can be drawn from a government agent's bad faith conduct.

*Ex parte Napper*, 322 S.W.3d at 231-35 (footnotes omitted).  In other words, the Texas Court of Criminal Appeals observed a link between the potential exculpatory value of the evidence and the likelihood that its destruction was done in bad faith.

Turning to Napper's case, the Texas Court of Criminal Appeals concluded that the trial court's decision to grant relief rested on faulty analysis.  The Texas Court of Appeals found, moreover, that the evidence at issue was of questionable value because the likelihood that additional testing would produce exculpatory results was "small."  In that respect, the Texas Court of Criminal Appeals found that the evidence at issue in Napper's case appeared more inculpatory than exculpatory in value:

The habeas court and the parties have arrived at some erroneous conclusions because they have treated the DNA evidence as a monolithic whole, instead of considering each of the four DNA samples separately. The habeas court made this mistake when it interpreted Orchid Cellmark's reference to an "unknown individual" as an indication that the link between [Napper] and the DNA evidence was weak. Although ReliaGene was able to obtain results from only one of the epithelial samples, Orchid Cellmark was able to obtain results from both epithelial samples. For both samples, Orchid Cellmark detected a primary DNA profile that matched the victim. One of the samples also contained some minor alleles matching [Napper]'s profile. The other epithelial sample contained minor alleles that did not match either the victim or [Napper]. These alleles belonged to another individual (or individuals), whose identity was, of course, "unknown." Subsequent testing was done to attempt to rule in or rule out individuals who were involved in DNA testing as a possible source of contamination. Notably, Orchid Cellmark was able to rule out the persons from HPD who were originally involved in collecting and testing the material: Verbitskey, Hilleman, Childs-Henry, and Chu did not contribute the "unknown person's" DNA.

Although an unknown person's DNA was detected in one of the epithelial samples, that fact does not have any tendency to exculpate [Napper]. Because the epithelial samples are composed of cells that are easily shed, such as skin cells, the DNA in question did not necessarily come from the perpetrator — it could have come from anyone who had recent contact with the victim. It is also possible that the extraneous alleles are the result of contamination, or the "allele drop-in" (referred to by Pineda) that might occur as a result of repeated testing. Had the sperm samples yielded an "unknown person's" DNA, that fact might have been significant, but that is not what happened.

The same fallacy of treating the DNA results as a monolithic whole also underlies the State's and [Napper]'s competing positions regarding why the outside labs' test results differ from those obtained by HPD. Although the State contends that the difference in results is due to the quantitative decline of the sample, [Napper] questions how that can be, when the outside labs were able to obtain a complete profile matching the victim. The answer to [Napper]'s question is simple once the samples are treated separately: The epithelial samples have consistently matched the victim throughout all of the testing but have never provided strong results with respect to the perpetrator. Chu's STR testing detected a single allele in one of the epithelial samples that was "unique" to [Napper]'s profile (*i.e.* not possessed by the victim). Chu's

testing of the other epithelial sample revealed no unique alleles. The one unique allele that was detected was one of nine unique alleles possessed by [Napper] that was subject to testing.

The outside labs actually detected a greater number of alleles unique to [Napper]'s profile. ReliaGene detected two of twelve tested-for unique alleles, while Orchid Cellmark detected four of fourteen tested-for unique alleles. Although the habeas record does not contain a statistical calculation for the random match probability of the single unique epithelial allele detected by Chu, it seems likely that the four of fourteen unique alleles detected by Orchid Cellmark yields a stronger link to [Napper] than the one of nine unique alleles detected in HPD's testing.

Even if that one unique allele detected by Chu somehow carried special statistical significance that provided a stronger link to [Napper] than the four unique alleles detected by Orchid Cellmark (and the two detected by ReliaGene), that would not make the Orchid Cellmark (or ReliaGene) results exculpatory. ReliaGene's and Orchid Cellmark's failure to detect the unique allele detected in Chu's testing is easily explained, as the State points out, by the quantitative decline of the sample. Although Chu had access to a liquid extract for his testing, ReliaGene and Orchid Cellmark were forced to use a buffer solution to re-suspend possible trace amounts of DNA attached to the walls of seemingly empty tubes.

Because the epithelial DNA was originally derived from cells from the skin of the victim's face, one would expect the victim's cells in the epithelial sample to be, by far, the most abundant, explaining the outside labs' ability to obtain a full DNA profile matching the victim, even from the trace amounts of DNA. Chu's ability to detect only one foreign allele suggests that the epithelial samples contained only a small amount of DNA extraneous to the victim. So it is not surprising that this single foreign allele would be lost after the massive decline in the quantity of the sample. Likewise, Orchid Cellmark's failure to detect one of the alleles detected by ReliaGene could have resulted from the further decline in the sample caused by the second round of tests.

If the testing of the three labs is considered together, a stronger link to [Napper] is established. Each lab detected at least one unique allele that was not detected by the others. Such results could be explained by the loss of some alleles caused by a quantitative decline in the sample, combined with the detection of additional alleles through progressively more sensitive techniques (or perhaps by chance). If all of the detected alleles that correspond to the

44

tested loci are considered without regard to which lab detected them, then there were six alleles unique to [Napper] out of fourteen that he possessed that were subjected to tests. We do not know if a statistical calculation could be done that incorporated all three labs' results. We simply point out that the discovery of diverse alleles unique to [Napper] by the three labs tends to inculpate [Napper]. So, the further testing of the epithelial samples seems to have produced a stronger inculpatory inference than the epithelial samples originally provided.

It is nevertheless true that the epithelial results do not approach the strength of Chu's results for the sperm samples. The outside labs were not able to obtain any results for the sperm samples. The failure to obtain results is not exculpatory in itself; it might simply mean that the samples had degraded to the point where re-testing could not produce any results. But with respect to the strength of the test results, the parties and the habeas court have failed to appreciate the differences between the sperm samples and the epithelial samples. It is true that ReliaGene and Orchid Cellmark produced results that are much weaker statistically than some of the results obtained by Chu. [Napper] sees this difference in the strength of the results as indicating that the DNA evidence shows the link to [Napper] to be less substantial than previously thought, while the State chalks up this difference to the loss of alleles caused by a quantitative decline in the sample. Neither position is correct. The difference in the statistical strength of the results is a consequence of the fact that different samples are at issue. Chu relied upon the sperm samples at trial, and Bromwich's statistical calculation of 1 in 232,000 was undoubtedly based upon the sperm samples. The results obtained by the outside labs were for the inferior epithelial samples. For the epithelial samples, it appears that the outside labs obtained stronger results than Chu obtained, and discovered additional alleles possessed by [Napper] that were not previously discovered in the HPD testing. Although we do not entirely agree with the State's reasoning, we agree that the subsequent test results tend to confirm [Napper]'s guilt.

In assessing whether the consumed DNA material constituted "potentially useful" evidence, we consider the likelihood that a defense expert would have produced exculpatory results if given the opportunity to test sperm and epithelial portions of the original liquid DNA extract. We conclude that the likelihood of an exculpatory result is small, though not zero. Although Bromwich criticized Childs-Henry's lack of documentation and would have preferred that she run more definitive tests for semen, he did not suggest that she obtained an incorrect result, or that any flaw existed in her analysis that

45

would have undermined the validity of Chu's results. As we have explained, Bromwich found that Chu had "developed clean, interpretable profiles" that were "good quality and clear results from potentially difficult forensic evidence samples." Bromwich calculated a 1 in 232,000 random match probability for the African–American population that was "relatively strong" given the nature of the sample. We also note that it is virtually impossible for [Napper]'s DNA to have contaminated the original test results because the swab DNA was typed before [Napper] was even a suspect.

Nevertheless, in a city the size of Houston, a 1 in 232,000 probability raises the possibility that a handful of people might perhaps be included in the DNA results. A defendant in [Napper]'s position would hope that testing by a defense expert would detect additional alleles inconsistent with the defendant's DNA profile. And given the now-tarnished reputation of the HPD Crime Lab, a defendant might even hope that a defense expert would obtain dramatically different results, revealing some unknown malfeasance by the lab.

The re-testing by ReliaGene and Orchid Cellmark tend to undercut any such hopes, as the re-testing has produced results consistent with [Napper]'s DNA. But, while contamination of the original HPD test results with [Napper]'s DNA is a virtual impossibility, it is possible that contamination could have occurred later, in time to skew the re-testing results. Dr. Johnson believed that to be a possibility, Orchid Cellmark's "unknown person" result for one of the epithelial samples may be an example of contamination, and the HPD Crime Lab's act of forwarding an incorrect reference sample to ReliaGene hardly inspires confidence. The possibility of contamination may also be increased somewhat by the fact that the tubes were seemingly empty, with relevant Crime Lab personnel believing that the evidence had been consumed, so the HPD Crime Lab may not have had as much incentive to maintain the integrity of the evidence.

Given the paucity of authority and the brevity of the pronouncements regarding whether evidence is even "potentially useful," we are not certain whether an inquiry into potential usefulness would include looking at other evidence at trial tending to show that the defendant was guilty and, therefore, that DNA testing by a defense expert would not likely yield exculpatory results. The background portion of this opinion outlines the substantial, persuasive evidence of [Napper]'s guilt aside from the DNA test results, and we will discuss this evidence in connection with the ineffective assistance of counsel claim later in this opinion. This inculpatory evidence would further

46

support a conclusion that the likelihood of exculpatory results from defense
DNA testing was slim.

*Ex parte Napper*, 322 S.W.3d at 235-38.  The Texas Court of Criminal Appeals stopped short

of finding that the evidence at issue in Napper's case was not potentially useful in character,

concluding only that, "[w]here exulpatory results were unlikely, an inference can be drawn

that the DNA analyst was probably not acting with the intent to deprive the defendant of

exculpatory evidence when he destroyed the sample."  *Id.* at 238.

Next, the Texas Court of Criminal Appeals turned to the issue of whether there was

any support for the trial court's finding that evidence was destroyed in bad faith by HPD

Crime Lab employees.   The Court of Criminal Appeals answered that question in the

negative by concluding, ultimately, that the evidence was consumed during a testing process

that was fraught with mistake or negligence, but not bad faith, as follows:

> The habeas court's finding of "bad faith" is based in part upon what we
> have already recognized to be an inaccurate definition. "Bad faith" is more
> than simply being aware that one's action or inaction could result in the loss
> of something that is recognized to be evidence. As the cases we have discussed
> show, bad faith entails some sort of improper motive, such as personal animus
> against the defendant or a desire to prevent the defendant from obtaining
> evidence that might be useful. Bad faith cannot be established by showing
> simply that the analyst destroyed the evidence without thought, or did so
> because that was the common practice, or did so because the analyst believed
> unreasonably that he was following the proper procedure.

> No evidence in this case suggests that Childs-Henry or Chu acted in bad
> faith. Chu specifically stated in his affidavit that his consumption of the
> evidence was not the result of a desire to prevent additional testing. The habeas
> court was not required to believe that affidavit, but to find bad faith, a finder
> of fact must do more than simply disbelieve proffered evidence of good faith:
> There must be some evidence from which an inference of bad faith can be
> drawn. There is no such evidence here. Neither analyst has been shown to have

any animus against [Napper] — [Napper] was not even a suspect at the time testing was conducted. Nor is there any evidence that the analysts were aware of any impropriety in their own conduct, such as a history of falsifying test results. The Bromwich Report explained that the failures in the HPD Crime Lab were the result of a lack of training and of the isolation of the DNA section of the Crime Lab from the forensic community, not the actions of "rogue analysts."

The habeas court gave three reasons for finding bad faith. First, it concluded that the analysts must have been aware of a law that was enacted but not yet effective. But the history of Article 38.39 reveals that the statute was not enacted until after the HPD Crime Lab's DNA testing in this case. The legislation was originally introduced on January 17, 2001. The bill passed the Senate on February 19, 2001, and passed the House in an amended version on March 22, 2001. After the bill was sent to a conference committee, it passed both houses of the Legislature on April 3, 2001. The bill was signed by the Governor on April 5, 2001, and made effective immediately. As we explained earlier, the DNA from the swab samples was typed on February 20, 2001. We find no basis for the habeas court's conclusion that the analysts were aware of this impending legislation.

Regarding the FBI and NRC recommended standards, we agree that the HPD Crime Lab's analysts should have been aware of them. But given the lack of training and the isolation of the crime lab from the forensic community, it is questionable whether the analysts were actually aware of them. Even if they were, there is no evidence to suggest that they believed that the standards regarding preservation of a sample would apply in this case.

When Childs-Henry discarded the original swabs, there were redundant samples of DNA. Although it would have been better to retain the original swabs, the existence of redundant samples would appear to satisfy the FBI and NRC guidelines.

The evidence is clear that, unlike Childs-Henry, Chu understood that his work would consume all of the remaining sample. The habeas court cited Chu's explanation that he had to consume the sample due to the small amount of DNA, but Chu further testified at trial to conducting a cross analysis of the swabs, which could not have occurred unless he tested the material from both swabs, which in turn would require consuming all of the sample. As the Bromwich Report explains, Chu made a mistake in testing samples from both swabs. He should have saved one of the epithelial samples and one of the

sperm samples for later testing, which could have been conducted by another DNA lab. But the Bromwich Report does not suggest that Chu's failure to do so was anything other than a mistake.

Finally, though we accept that the habeas court can, from its own recollection, recount common practices within that court, we cannot accept the habeas court's conclusion that the HPD Crime Lab analysts must have been aware of a practice in Harris County regarding any notification that evidence would be consumed in testing. As an example of this practice, the habeas court cited the signed acknowledgment arising in the instant habeas proceedings regarding Orchid Cellmark's anticipated testing. This document, executed years after the public disclosure of serious problems with the HPD Crime Lab, is not particularly probative of the practice followed before these problems came to light. Further, given the trace amounts of DNA and ReliaGene's use of a buffer solution, ReliaGene's testing could have destroyed any remaining sample. At the very least, Pineda's affidavit suggests that ReliaGene's testing could have been expected to degrade the sample further, resulting in a further loss of alleles for any subsequent testing. Yet, there was no acknowledgment regarding ReliaGene's anticipated testing.

Moreover, we see a practical problem with the idea that analysts should have notified the prosecutor of the possible consumption of the evidence in this case. HPD's DNA testing was conducted, and the liquid extract was consumed, before there were any suspects. Whatever the practice of the Harris County Criminal District Courts, there was no defense attorney for the District Attorney's Office to notify at the time DNA testing was conducted. Given the lack of training received by the HPD Crime Lab's DNA analysts, nothing in the record suggests that Childs-Henry and Chu were aware of any need to notify the District Attorney's Office before consuming the sample, especially since no prosecution was pending.

*Ex parte Napper*, 322 S.W.3d at 238-40 (footnotes omitted). Thus, the Texas Court of

Criminal Appeals rejected Napper's claim that the State destroyed potentially useful evidence

with bad faith in violation of his right to due process as articulated in *Youngblood*.

Napper notes that the trial court, on its initial review of his *Youngblood* claim, reached

the opposite conclusion and recommended that relief be granted. Napper urges this Court

to defer to the trial court's decision.  It is well settled that a federal habeas corpus court looks only to the last reasoned opinion on the merits of a claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).  Napper does not show that the Texas Court of Criminal Appeals erred or that its decision to deny relief was based on an unreasonable determination of the facts in light of the evidence presented in the state habeas proceedings.  *See* 28 U.S.C. § 2254(d)(2). Napper does not meet his burden to present clear and convincing evidence that the fact findings made by the Texas Court of Criminal Appeals are incorrect.  28 U.S.C. § 2254(e)(1). In that regard, even assuming that the DNA evidence at issue was potentially useful to the defense, Napper does not establish that the evidence was destroyed intentionally in bad faith with knowledge of its value as opposed to negligence or faulty procedures.

As the Texas Court of Criminal Appeals correctly noted, Napper's failure to show that evidence (potentially useful or otherwise) was destroyed in bad faith is fatal to Napper's claim. *Youngblood*, 488 U.S. at 56 n.*; *Trombetta*, 467 U.S. at 489.  The Supreme Court has held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 at 51, 57-58.  In so holding, the Supreme Court reasoned that the bad faith requirement "both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* at 58.  Absent a showing that evidence was destroyed in bad faith, Napper fails to demonstrate a

50

constitutional violation.  Based on this record, Napper has failed to show that the state court's decision to reject his claims was contrary to or involved an unreasonable application of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Thus, Napper is not entitled to federal habeas corpus relief on his claim concerning the destruction of evidence under *Youngblood*.

## B.    False Testimony

Napper contends that the prosecutor engaged in misconduct by sponsoring false testimony from HPD Crime Lab chemist Joseph Chu.   In particular, Napper complains that Joseph Chu gave false testimony when he estimated the statistical frequency of DNA among the  African-American  population.    Napper  notes  that,  at  trial,  Chu  testified  that  the probability of another individual being the contributor of the semen to be somewhere around "1 in 1.3 trillion" and that he was 99% sure of the match.  In its review of Chu's work, the Bromwich Report estimated that the odds were around 1 in 232,000.  Additional testing of a different sample by Orchid Cellmark resulted in an estimate that was significantly lower (1 in 255).  Napper maintains, therefore, that Chu gave false testimony by overstating the probability that the semen recovered from the victim's face matched his DNA. The Texas Court of Criminal Appeals rejected this claim in its published opinion on state habeas corpus review.  The respondent maintains that Napper is not entitled to relief under the deferential AEDPA  standard  because  he  does  not  demonstrate  that  the  Texas  Court  of  Criminal Appeals's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent.

The Supreme Court has held that the State denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.  *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). To establish a due process violation based on the government's use of false or misleading testimony, a habeas petitioner must demonstrate the following: "(1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007) (citing *May v. Collins*, 955 F.2d 299, 315 (5th Cir. 1992)); *Faulder*, 81 F.3d at 519.  A witness's testimony is "material" in this context if the false testimony could "in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154.

Napper's claim concerning the testimony at issue was rejected by the state habeas corpus court and the Texas Court of Criminal Appeals, which found that Chu did not commit perjury and that, moreover, the State did not "knowingly or unknowingly" use false testimony.  Before reaching this conclusion, however, the Court of Criminal Appeals addressed the proper categorization of the claim by distinguishing those involving perjury as opposed to those involving testimony that was false:

> [Napper] claims that Chu's statistical frequency estimate constituted "false testimony" and "possible perjury" by a prosecution witness in violation of the Fourteenth Amendment to the United States Constitution. To support his claim, [Napper] relies upon statements in the Bromwich Report, a letter from Orchid Cellmark, and statements made by Dr. Johnson in her habeas affidavit.

52

From the Bromwich Report, [Napper] cites statements that Chu's statistical frequency estimate was "incorrect and misleading" and based upon a practice that was "extremely flawed." [Napper] characterizes Orchid Cellmark's statistical frequency estimate of 1 in 255 for African–Americans as "the true statistical frequency for black persons." And [Napper] cites Dr. Johnson's statements that Chu's trial testimony was "completely unsupported scientifically" and "patently false," as well as her statement that a mixture of DNA "cannot possibly statistically match only one person."

Finding in the State's favor on this claim, the habeas court concluded: "Because the State did not knowingly use false or perjured testimony at trial, [Napper] failed to show that he was denied Due Process under the Fourteenth Amendment to the United States Constitution."

[Napper] argues in his brief that "logic suggests that . . . if the DNA found on the evidence was a mixture of more than one person's DNA, then it could not have come from only one person." [Napper] then echoes statements from the Bromwich Report and from Dr. Johnson to the effect that Chu's testimony was "contradictory, incorrect, misleading, completely inappropriate . . . , internally contradictory . . . , unsupported scientifically" and "patently false." [Napper] contends that Chu, an agent of the State, committed perjury and that the prosecutor unknowingly presented Chu's false testimony. [Napper] also argues that the testimony was harmful because DNA is powerful evidence and Chu's scientific conclusion was dramatic and cast doubt on all of the defensive evidence as well. [Napper] also points to Orchid Cellmark's 1 in 255 estimate and the Bromwich Report's 1 in 232,000 estimate as differing from Chu's claim that no one on Earth but [Napper] could have committed the crime.

The State counters that Chu's testimony was not perjury because no evidence shows that Chu had an intent to deceive or knew that his statistical calculations were false. Characterizing Chu's calculations as "false" or "arguably false," the State contends that [Napper] is required to show by a preponderance of the evidence that the testimony contributed to his conviction or punishment and that he did not do so. The State discusses a great deal of the evidence introduced at trial and concludes that "ample evidence," aside from Chu's testimony, demonstrates [Napper]'s guilt.

*Ex parte Napper*, 322 S.W.3d at 240-41 (footnote omitted).  By focusing on Napper's precise

allegation (that the State unknowingly used false testimony), the Texas Court of Criminal

Appeals clarified the category of his claim to ensure that it followed the appropriate legal standard:

> How we categorize [Napper]'s claim is crucial to determining the standard of materiality or harm to be applied.

> (a) Knowing use of perjured testimony — direct appeal

> A prosecutor who procures a conviction through the knowing use of perjured testimony violates due process:

>> [Due process is violated] if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. [*Mooney v. Holohan*, 294 U.S. 103, 112 (1935).]

> A conviction is considered to have been procured through the use of perjured testimony if the perjured testimony is material. The standard of materiality for a prosecutor's knowing use of perjured testimony is the harmless error standard articulated in *Chapman v. California*, [386 U.S. 18 (1967)]: the evidence is material (and harmful) unless it can be determined beyond a reasonable doubt that the testimony made no contribution to the defendant's conviction or punishment. [*Ex parte Fierro*, 934 S.W.2d 370, 372-73 (Tex. Crim. App. 1996).] This most favorable materiality or harm standard is available to a defendant on direct appeal. [*Id.* at 373.]

> (b) Knowing use of perjury — habeas corpus

> On habeas corpus, the standard of harm that must be satisfied to obtain relief may be more burdensome to the defendant than the standard of materiality that must be satisfied to establish a due process violation. [*Id.* at 373-74.] In *Ex parte Fierro*, we determined that, where the habeas [Napper] "had the opportunity to discover the basis of his claim in time to advance it at trial or in a motion for new trial," he must show "by a preponderance of the evidence that the error contributed to his conviction or punishment." [*Id.* at

374-75 & n.10.]  In other words, we employed the normal standard on habeas review, with the burden on [Napper]. [*Id.* at 372.]

Where the habeas [Napper] lacked such an opportunity, we left open the possibility that he might "avail himself of the *Chapman* harmless error standard."  [*Id.* at 375 n.10.]

(c) Unknowing use of perjured testimony — habeas corpus

We have recently held that due process may be violated by a prosecutor's unknowing use of perjured testimony.  In *Ex parte Chabot*, the applicant had no prior opportunity to discover the basis for his claim that DNA evidence proved that the State's witness had perjured himself. [300 S.W.3d at 700.]  In discussing what harm standard to employ under those circumstances, we said, "[W]e see no reason for subjecting the two types of errors [knowing versus unknowing use of perjured testimony] to different standards of harm."  [*Id.* at 771.]  That is, the preponderance of the evidence standard applies, on habeas review, to either the knowing or the unknowing use of perjured testimony.

*Chabot* did not settle the question left open in *Fierro* regarding whether a more favorable standard of harm may apply to the knowing use of perjured testimony that the habeas [Napper] had no prior opportunity to discover.  Rather, *Chabot* does not appear to have taken into account the caveat in *Fierro*, and so *Chabot* simply stands for the proposition that the preponderance of the evidence standard is appropriate for the unknowing use of perjured testimony that the habeas [Napper] had no prior opportunity to discover.  It remains unsettled whether a more favorable standard might be available to a defendant in the "knowing use" context.

(d) False testimony as opposed to perjured testimony

In *Estrada v. State*, we held on direct appeal that false testimony that was not perjury resulted in a due process violation when there was "a fair probability that [the] death sentence was based upon . . . incorrect testimony."  [313 S.W.3d at 287.]  In that case, the State's witness gave inaccurate testimony about the prison classification system but was not aware of the inaccuracy.  [*Id.* at 286–87.]  The jury sent out a note regarding the very subject matter of this testimony.  [*Id.*]  It was later determined that the testimony was inaccurate, and the State confessed error on direct appeal.  [*Id.*]  In sustaining the defendant's contention, we held that his complaint was not

55

forfeited because the defendant "could not reasonably be expected to have known that the testimony was false at the time that it was made." [*Id.* at 288.]

(e) False testimony in the actual innocence context

Finally, we observe that our "actual innocence" jurisprudence could encompass a claim on habeas that involved newly discovered evidence that a witness's testimony was false. [*See Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996) (recantation of trial testimony).] Under that jurisprudence, the habeas applicant must show "by clear and convincing evidence that, presented with both the inculpatory evidence at trial and the newly discovered or available evidence of innocence, no reasonable juror would have convicted him." [*Ex parte Chavez*, 213 S.W.3d 320, 322 (Tex. Crim. App. 2006).]

*Ex parte Napper*, 322 S.W.3d at 241-43 (footnotes moved to text). The Texas Court of

Criminal Appeals concluded that, under the governing legal standard, Napper was not

entitled to relief because there was no evidence that Chu "believed his testimony was

inaccurate" or that he intended to testify falsely at Napper's trial:

To obtain the most favorable standard of materiality or harm that might possibly apply, [Napper] must show that the State knowingly used perjured testimony and that he did not have an opportunity to discover the perjury in time to present a claim at trial or in a motion for new trial (or perhaps on appeal). No one has contended in this case that the prosecutors were aware that there was any problem with Chu's statistical frequency estimate. Nevertheless, we treat perjured testimony as knowingly used if the witness was a member of the "prosecution team." To obtain review under the most favorable standard of materiality or harm, then, [Napper] must at least show: (1) that Chu was a member of the prosecution team, (2) that Chu committed perjury, and (3) that [Napper] did not have an opportunity to discover the perjury in time to present his claim at an earlier proceeding.

In Texas, the crime of perjury is committed if "with intent to deceive and with knowledge of the statement's meaning" a person makes a false statement under oath or unsworn declaration. [Tᴇx Pᴇɴᴀʟ Cᴏᴅᴇ § 37.02(a).] In connection with a claim regarding the knowing use of perjured testimony, the First Circuit relied upon federal law defining perjury as "the willful intent to provide false testimony, rather than as a result of confusion, mistake, or

faulty memory." [*United States v. Tavares*, 93 F.3d 10, 14 (1st Cir. 1996).] The Fifth Circuit, however, has eschewed "the strict legal definition of perjury" and found "perjury" within the meaning of the prohibition against its knowing use when witnesses "did not candidly respond to the defense counsel's questions." [*United States v. Carter*, 566 F.2d 1265, 1270 (5th Cir. 1978).]

But regardless of the precise contours of the meaning of "perjury" for the purpose of determining a due process violation, [Napper] has not demonstrated that Chu committed perjury in this case. The habeas court found against [Napper] on this claim, so we review the evidence deferentially in the State's favor. Nothing in the record before us suggests that Chu intended to provide false testimony or to deceive, or that he was less than candid in his testimony. In other words, we have no reason to believe that Chu thought his testimony was inaccurate. The Bromwich Report indicates that Chu's method of calculating the statistical frequency estimate, though extremely flawed, was the HPD Crime Lab's usual practice. The Bromwich Report did not suggest that HPD analysts were committing perjury every time they testified to their usual calculations in court. As we have pointed out, the report said that the problems with the HPD Crime Lab were due to poor training and not to rogue analysts. There is ample support for a finding that Chu did not commit perjury, consistent with the habeas court's conclusion that the State did not knowingly use perjured testimony. Because Chu did not commit perjury, [Napper]'s claim does not fall within *Fierro*'s caveat regarding knowing-use-of-perjury claims that could not have been presented previously. We again leave open that question.

For habeas corpus proceedings involving the unknowing use of perjured testimony, the harm standard would be preponderance of the evidence, as we have stated above. [Napper] would not be entitled to a more favorable standard for the unknowing use of false (but not perjured) testimony. The preponderance of the evidence standard is less favorable to [Napper] than the standard employed in analyzing an ineffective assistance of counsel claim under *Strickland v. Washington*[, 466 U.S. 668, 693 (1984)]. As explained below, [Napper] fails to meet the prejudice prong of *Strickland*. This means that [Napper]'s false evidence claim must also necessarily fail.

*Ex parte Napper*, 322 S.W.3d 243-44. As this discussion reflects, the Texas Court of

Criminal Appeals denied relief after concluding that the State did not "knowingly or

unknowingly" sponsor testimony that was perjured or fabricated.  In doing so, it applied both state and federal law.

The respondent argues that, to the extent that Napper's claim was denied under Texas law, he is not entitled to review under the federal habeas corpus statutes.  The respondent is correct.  It is true that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  An error of state law "does not justify federal habeas corpus relief unless it is of such magnitude as to constitute a denial of fundamental fairness under the due process clause."  *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983). As is evident from the discussion of Napper's claim, however, the Texas Court of Criminal Appeals does not appear to have rested its decision entirely on an independent state ground. Thus, the claim is not precluded from federal habeas corpus review. *See Michigan v.Long*, 463 U.S. 1032, 1041 (1983).

To the extent that the Texas Court of Criminal Appeals reached a decision that was intertwined with state and federal law, the respondent maintains further that Napper's claim does not merit relief because, while Chu's testimony may have been based on a miscalculation, a mistake in testimony does not demonstrate an intentional falsehood of the sort that violates the Due Process Clause.  Napper disagrees and insists that he is entitled to relief because the Texas Court of Criminal Appeals wrongly concluded that he had to demonstrate "knowing" use of false testimony in order to establish a valid claim.  (Doc. # 25,

at 24-25).  Napper argues that, contrary to the state court's decision, it is enough that the testimony was "false."  (*Id.*).

Napper's argument is misplaced.  While some courts recognize a due process violation when false or perjured testimony is provided without the government's knowledge,[6] a federal habeas corpus court is "limited by the AEDPA to applying only established Supreme Court precedent in our review of a state court's reasonableness."  *Kinsel v. Cain*, 647 F.3d 265, 272 (5th Cir. 2011) (citations omitted), *cert. denied*, 132 S. Ct. 854 (2011).  To warrant relief under existing precedent,[7] Napper must show that the State knowingly presented false testimony or allowed false testimony to go uncorrected.  *See Napue*, 360 U.S. at 269.  The record in this case reflects that Chu's testimony (about the statistical probability of the evidence being a match) was an overstatement that was based on a mistake.  Chu may have been wrong, but Napper cites no authority showing that mistaken testimony is sufficient to demonstrate a violation of the Due Process Clause.  *See Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) ("Conflicting or inconsistent testimony is insufficient to establish perjury.").  Rather, flawed testimony merely establishes a credibility question for the finder of fact. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (inconsistencies in witnesses'

---

[6]     For example, the Texas Court of Criminal Appeals noted in Napper's case that, in the Second Circuit, "the unknowing use of perjured testimony violates due process if a stronger showing of materiality or harm is made than is required by the *Chapman* standard." *Ex parte Napper*, 322 S.W.3d at 242, n.151 (citing *Sanders v. Sullivan*, 863 F.2d 218, 225-26 (2nd Cir. 1988)).

[7]     To the extent that Napper contends that he is entitled to relief that is not dictated by precedent, the rule in *Teague v. Lane*, 489 U.S. 288, 310 (1989) also would appear to bar the application of a new constitutional rule of law.

testimony at trial are to be resolved by trier of fact and do not suffice to establish that certain testimony was perjured) (citing *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988).

Napper presents no evidence showing that Chu knew that his estimate was false or that he intentionally overstated the likelihood that Napper contributed the DNA found in the semen that was recovered from the victim's face.  Even assuming that the testimony was untrue, Napper does not allege or show that the State knew that it was false but allowed the falsehood to go uncorrected.  Under these circumstances, Napper fails to establish that a constitutional violation occurred.  *See Napue*, 360 U.S. at 269-70; *Reed*, 504 F.3d at 473.

Likewise, Chu's testimony about the DNA evidence and his certainty of the match is not clearly material under the circumstances of this case because, as the Texas Court of Criminal Appeals found, there was "no real probability" of a different outcome at Napper's trial.  *See Ex parte Napper*, 322 S.W.3d at 249.  The record reflects that the State's case against Napper was very strong.  Other children witnessed the kidnapping.  The victim identified Napper before trial as the man who kidnapped and sexually assaulted him.  Although the victim did not identify Napper at trial, where the victim appeared by closed-circuit television, there was testimony from an officer that Napper had changed his appearance since his arrest.  The victim identified Napper's car, his residence, and items from the home, including the bottle of orange lotion recovered from Napper's bedroom, where the sexual assault occurred.  There is no dispute that, apart from Chu's testimony, the available DNA evidence that was subject to re-testing inculpated Napper as the perpetrator.  The prosecutor mentioned the DNA evidence during her summation, but she did not emphasize

60

the test results or Chu's testimony. *See Court Reporter's Record*, vol. 10, at 41-53. Although portions of Chu's testimony were inconsistent and his estimate was mistaken, it is unlikely that his comments could in any reasonable likelihood have affected the jury's verdict. *See Giglio*, 405 U.S. at 154. For this additional reason, the record does not disclose a constitutional violation as the result of Chu's flawed testimony.

Based on the substantial nature of the State's case, the respondent maintains further that the error, if any, was harmless because Napper cannot show that Chu's overstatement had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that, on federal habeas corpus review under 28 U.S.C. § 2254, the *Brecht* standard of harmless error applies whether or not the state court conducted a harmlessness review under *Chapman*). For the same reasons outlined above in connection with its analysis of the testimony's materiality, the Court agrees that the error, if any, was harmless. *See McDaniel v. Brown*, — U.S. —, 130 S. Ct. 665, 673 (2010). Napper fails to show otherwise. More importantly, he does not demonstrate that the Texas Court of Criminal Appeals's conclusion was objectively unreasonable. Thus, Napper is not entitled to federal habeas relief on this issue.

### C    Ineffective Assistance of Counsel at Trial

Napper was represented at trial by local criminal defense counsel Steven Greenlee. As with his application in the state habeas corpus court, Napper contends that he was denied effective assistance of counsel at trial because Greenlee failed to hire a forensic DNA expert

to assist him with his defense or move for a continuance to request additional DNA testing in his case.  These claims, as well as several other allegations of ineffective-assistance that he raises for the first time in his amended petition, are addressed further below following a brief overview of the legal standard that governs claims of ineffective assistance of counsel.[8]

Claims for ineffective assistance of counsel are analyzed under the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency.  *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable."  *Strickland*, 466 U.S. at 687.

The first prong of the governing standard is only satisfied where the defendant shows that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687.  Scrutiny of counsel's performance must be "highly deferential," and a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct

---

[8]    The other allegations of ineffective assistance include Napper's claims that his counsel was deficient for (1) failing to file a motion to suppress the pretrial identification; (2) failing to prepare him to testify; (3) failing to make an opening statement; and (4) that the cumulative effect of his counsel's deficient performance tainted his trial with fundamental error.  The respondent notes that Napper did not raise these claims in state court or in his original petition.  As outlined above, these claims, which Napper included for the first time in his amended petition, are barred by the one-year statute of limitations.  These claims are also unexhausted and barred by the doctrine of procedural default.  *See* 28 U.S.C. § 2254(b)(2). They are also without merit for reasons discussed briefly below.

from counsel's perspective at the time." *Id.* at 689.  To prove prejudice, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694.  "A reasonable probability" requires "a 'substantial' not just a 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (quoting *Richter*, 131 S. Ct. at 791).

To the extent that two of Napper's ineffective-assistance claims were rejected in state court, the central question is not whether this Court "'believes the state court's determination' under the *Strickland* standard 'was incorrect but whether the determination was unreasonable — a substantially higher standard.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007)).  In addition, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  *Knowles*, 556 U.S. at 123 (citation omitted).  Thus, this standard is "doubly deferential" on habeas corpus review.  *Id.*; *see also Richter*, 131 S. Ct. at 788 (emphasizing that the standards created by *Strickland* and § 2254(d) are "highly deferential," and "'doubly' so" when applied in tandem) (citations and quotations omitted).  Napper's allegations of deficient performance are discussed separately below.

### (1)    Failure to hire a forensic expert or move for a continuance to request additional testing of DNA evidence

Napper argues that Greenlee was deficient because he failed to hire a forensic expert to assist him at trial or move for a continuance to request additional DNA testing.  In his

affidavit to the state habeas corpus court, Greenlee noted that he did file a pretrial motion to

hire a DNA expert.  Although the trial court granted that motion, Greenlee explained that he

did not retain a DNA expert or request a continuance to conduct additional testing because

he was told that there was no genetic material left for independent analysis.  The state habeas

corpus court, which presided over the trial, found that Greenlee's explanation was "credible"

and that his strategic decisions on this issue were not deficient.  *Ex parte Napper*, No.

15,601-03 at 771-73.  The Texas Court of Criminal Appeals disagreed, reasoning that a DNA

expert may have helped Greenlee with his investigation and his effort to challenge the

testimony given at trial by HPD Crime Lab personnel:

> In his application, [Napper] contends that defense counsel Greenlee performed deficiently in failing to hire a forensic or DNA expert. [Napper] further claims that, had defense counsel hired an expert: (1) Chu's statistical analysis would have been revealed at trial as false, (2) the jury would have been made aware that Chu violated the standard of care in his profession when he consumed all of the DNA evidence, and (3) defense counsel would have been able to obtain the same type of testing that was later conducted by ReliaGene and Orchid Cellmark. [Napper] also contends that Greenlee performed deficiently by failing to object to the DNA test results on the basis of Chu's consumption of the sample, by failing to move for a continuance after Childs-Henry testified that there was liquid extract sample remaining so that DNA testing could then occur, and by failing to adequately cross-examine Childs-Henry and Chu at trial.
>
> In his brief, [Napper] also points to Greenlee's lack of prior experience in DNA matters and suggests that he could not possibly conduct a proper investigation without the help of an expert. He also argues that there was no good reason for Greenlee to forgo an expert witness who could have enhanced the defense trial strategy of emphasizing the unfairness of the lab's consumption of all of the DNA evidence. [Napper] also contends that there were many areas of possible impeachment of the State's experts that were not raised at trial. [Napper] also describes as "inexplicable" Greenlee's failure to

move for a continuance when Childs-Henry indicated that DNA extract still existed.

Regarding the prejudice prong of *Strickland*, [Napper] contends that, had counsel performed properly, the following information would have been learned and used at trial: (1) that Chu's statistical frequency estimate was illogical and false, (2) that the HPD Crime Lab's consumption of the entire sample was unnecessary and improper, (3) that the quality of Childs-Henry's testing for semen was poor, and (4) that obtaining DNA profiles from a mixture was fraught with difficulty. [Napper] contends that this information would have changed "the entire complexion of the case."

The State counters that Greenlee made strategic decisions with plausible bases after a thorough investigation. The State points to various acts by defense counsel and his articulated strategies. This discussion by the State essentially rehashes the habeas court's findings.

The court found that Greenlee's testimony at the evidentiary hearing was credible. The court found that Greenlee had a good working relationship with the prosecutors, who provided him with whatever information he requested, and had free access to the State's files and evidence. It also found that Greenlee had no reason to doubt Glaeser's representation that the DNA evidence had been consumed, with nothing left for an independent analysis. The court found that Greenlee's decision to proceed without an expert was based on a strategy of arguing to the jury the unfairness of being denied an opportunity to conduct independent testing. The court found that this strategy was formulated after a thorough investigation that included consulting at least one other defense attorney.

The court also pointed to Greenlee's strategy of cross-examining the crime scene officer, Verbitskey, to show that he was not qualified to collect the swabs from the victim's cheek and may have exposed the evidence to contamination. The court found that defense counsel's cross-examination of Childs-Henry was strategically designed to show that she was results-oriented, could not describe the protocol and procedures she followed in performing the DNA extraction, and could not confirm that she followed the proper steps in the proper order during the procedure. The court also found that Greenlee's cross-examination of Childs-Henry elicited what Greenlee perceived to be the beneficial testimony that only a "sloppy chemist" would consume all of the evidence in performing a DNA analysis. And the court found that defense counsel cross-examined Chu with a strategy toward "demonstrating that Chu

had consumed all of the DNA evidence without regard for the fact that the defense was denied an opportunity to conduct independent DNA testing." The court further found that Greenlee believed that his cross-examination succeeded in this purpose and that he did not need a consulting expert to accomplish that end.

The court also found that defense counsel emphasized in closing argument that the defense was unfairly denied the opportunity to conduct independent DNA testing and that the jury should not accept the DNA results solely on the word of the State's witnesses.

The court further found that defense counsel did not move to suppress the DNA test results because he did not believe he had a valid legal basis for doing so. The court also found that Greenlee was surprised by Childs-Henry's testimony that there was DNA sample remaining, that Greenlee explored this issue with the prosecutor and the State's witnesses, and that Greenlee determined that there was in fact no DNA sample left to test. And the court found that the problems with the HPD Crime Lab did not become public knowledge until November 2002. The court further found that, against counsel's advice, [Napper] made an intelligent, knowing, and voluntary decision to testify. The court found that Greenlee believed that the negative consequences of [Napper]'s decision to testify outweighed the negative impact of the DNA evidence.

Based upon its own independent recollection of the trial, the court found that Greenlee's cross-examination of HPD Crime Lab personnel was "effective trial strategy in that it was aggressive, probing, confrontational and effective" regarding an attack on the HPD Crime Lab protocol.  The court also found that Greenlee's decisions — not to retain a consulting expert, not to pursue independent DNA testing, and not to seek a continuance—"were all made after a thorough investigation and were reasonable trial strategy."  The court echoed this particular finding in its conclusions of law, and the court also concluded that [Napper] failed to show that the trial court would have committed error in denying a motion to suppress the HPD Crime Lab's DNA test results.

### 2. Deficient Performance

*Strickland* prescribes a two-part test for determining whether a defendant has been constitutionally deprived of effective assistance of counsel: (1) deficient performance, and (2) prejudice.  [466 U.S. at 687.]  Deficient

performance means that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." [*Id.*] To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." [*Id.* at 688.] When trial counsel does not conduct a complete investigation, his conduct is "reasonable only to the extent that reasonable professional judgments support the limitations on investigation." [*Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (internal quotation marks omitted)].

Despite the habeas court's findings, the record raises serious issues with respect to Greenlee's performance. One reason Greenlee gave for declining to hire an expert was that the expert might validate the procedures followed by the HPD Crime Lab in this case. But defense counsel could have initially hired an expert for consulting-only purposes, to be designated later as a testifying expert if the expert's opinions turned out to be favorable. In *Williams v. State*, a case decided years before [Napper]'s trial, we recognized that an indigent defendant was entitled to make his request for funds to hire an expert witness in an ex parte hearing. [958 S.W.2d 186, 194 (Tex. Crim. App. 1997).] The rationale underlying our holding was the need to protect the confidentiality of the defendant's work product. [*Id.*] In *Skinner v. State*, decided the same year as *Williams*, we explained that an expert's "comments about the strengths and weaknesses of the defense theory" were covered by the work product doctrine. [956 S.W.2d 532, 538-39 (Tex. Crim. App. 1997).] *Williams* also quoted a Fifth Circuit discussion that emphasized the need to treat monied and indigent defendants equally:

> The government should not be able to obtain a list of adverse witnesses in the case of a defendant unable to pay their fees when it is not able to do so in the cases of defendants able to pay witness fees. When an indigent defendant's case is subjected to pre-trial scrutiny by the prosecutor, while the monied defendant is able to proceed without such scrutiny, serious equal protection questions are raised . . . . [*Williams*, 958 S.W.2d at 193 n.8 (quoting *United States v. Meriwether*, 486 F.2d 498, 505–506 (5th Cir. 1973)).]

A defendant with the resources to hire his own expert could hire someone on a consulting-only basis without the State ever discovering that he had done so. [*See Pope v. State*, 207 S.W.3d 352, 365-66 (Tex. Crim. App. 2006) (citing *Williams* and observing that a "simple solution" to the possibility that a prosecutor could comment on the existence of a defense expert is that a

party can "investigate first, consult second, designate third").] Under *Williams* and *Skinner*, an indigent defendant has the same capability.

In choosing to forgo an expert, defense counsel elevated the importance of his own personal investigation of DNA science. We will not discount the possibility that an attorney with no prior knowledge of DNA matters may become sufficiently knowledgeable through his own diligent sifting of the scientific literature, without the aid of an expert. But it is apparent in this case that Greenlee was not able to acquire sufficient knowledge on his own. Had he done so, he would have known that the HPD Crime Lab failed to adhere to accepted practices when it consumed all of the DNA evidence, and he would have understood that Chu's statistical frequency estimate was probably incorrect.  Even without an expert of his own, Greenlee could have at least cross-examined Chu with relevant scientific literature—such as the FBI and NRC standards—regarding the desirability of retaining a portion of the DNA evidence for additional testing. [*See* Tex. R. Evid. 803(18) ("Learned Treatises" exception to the hearsay rule).] Defense counsel could have pointed out, through questioning and argument, that two of the tubes of DNA material were redundant and did not have to be tested. That Greenlee did none of these things shows that he was probably ill-equipped to research the field without expert assistance.

Even so, defense counsel should have conducted an investigation that was diligent enough to reveal that he needed the help of an expert in preparing for trial and cross-examining witnesses. In 2001, a variety of investigative tools existed that would have enabled Greenlee to determine that he needed an expert witness, including: an informal pre-hiring consultation with an expert, consultation with knowledgeable defense attorneys, continuing legal education, use of a medical library, and use of the internet. Although Greenlee consulted other attorneys, we cannot conclude that doing so was sufficient investigation in this case given the fact that Greenlee still lacked much understanding of DNA science.

And expert testimony would probably have given a boost to the defense beyond what could have been accomplished through cross-examination. A live expert could have explained that the FBI and NRC guidelines were not followed when Chu consumed virtually the entire sample in this case, and an expert could have testified to the flaws in Chu's statistical frequency calculation and given a more accurate calculation of the random match probability. A defense expert's testimony on these subjects would have been likely to carry more weight with a jury than cross-examination alone.

Cross-examination may render unnecessary the presentation of one's own expert, especially if the cross-examination aggressively exploits learned treatises, [*see id*.,] but that did not happen in this case.

Greenlee did bring up the unfairness of consuming the DNA evidence, but Chu's rejoinder was that the sample size was so small that it had to be used up. The defense's cross-examination of Chu gave the jury no reason to think that Chu's effective consumption of the entire sample was anything other than an unfortunate but unavoidable circumstance.

The only evidence that potentially attacked Chu's explanation was the testimony elicited from Childs-Henry that the entire sample could be consumed if the chemist was sloppy. But Childs-Henry also said that the entire sample could be consumed if it was too small, which was consistent with Chu's explanation. And while Childs-Henry indicated that the sample was large enough to have some left for re-testing, the credibility of that assessment was undermined by her error in believing that some sample still remained. Defense counsel did a creditable job of impeaching Childs-Henry with her inability to explain her own procedures; her mistake regarding the existence of any remaining sample, though a surprise, impeached her credibility as well.

However, we reject [Napper]'s contention that Greenlee was deficient in failing to move for a continuance after Childs-Henry's testimony that DNA material remained to be tested. The evidence at trial (as well as the habeas proceedings) was that Childs-Henry was simply mistaken in her belief that there was liquid extract remaining. We do not think her testimony at trial fairly raised the notion that there might be trace amounts of DNA adhering to seemingly empty tubes. To the extent that her testimony suggested that there should have been DNA material remaining, that conclusion was one that Greenlee should have drawn prior to trial, and we have already concluded that Greenlee was deficient in that regard.

*Ex parte Napper*, 322 S.W.3d at 244-49.  The Texas Court of Criminal Appeals found, however, that Napper was not ultimately prejudiced as a result of Greenlee's deficient performance because there was "no real probability" that, but for Greenlee's failure to retain a DNA expert, the outcome would have been different:

### 3. Prejudice

Having found deficient performance, we turn to the question of prejudice. The prejudice prong of *Strickland* requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [466 U.S. at 694.]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*Id.*]  It is not enough that counsel's errors could have had "some conceivable effect on the outcome of the proceeding," but a defendant does not have to show that counsel's deficient conduct "more likely than not altered the outcome of the case." [*Id.* at 693].  This usual standard for showing prejudice is not always sufficient, however. If the proceeding was "rendered neither unreliable nor fundamentally unfair" by counsel's deficient performance, then the prejudice question can be answered in the negative to prevent the defendant from obtaining a "windfall."  [*Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993)].

As we explained in connection with his *Youngblood* claim, [Napper] would not have been entitled to the suppression of the DNA test results.  Had counsel conducted a proper investigation, an attack might have been made on the quality of Childs-Henry's testing, but there is no indication that such an attack would do anything to undermine the validity of Chu's results, which were based upon his own testing. Defense counsel would have been able to introduce evidence that consuming the entire sample was bad laboratory practice, but there is no indication that the test results themselves flowed from any flawed practices.  To the contrary, Bromwich characterized Chu's work as generating "good quality and clear results" and developing "clean, interpretable profiles."  And a jury would still be confronted with the fact that the genetic typing occurred before [Napper] even became a suspect — eliminating the possibility of contamination from [Napper]'s own DNA.

Had defense counsel conducted a proper investigation, he would have been able to introduce evidence that Chu's statistical frequency estimate was flawed, and he would have been able to introduce a correct estimate in line with Bromwich's calculations: *e.g.* a random match probability for the African–American population of 1 in 232,000. A probability of 1 in 232,000 is still quite low, although, with a city the size of Houston, it might allow for the possibility of a handful of other people matching the test results.

But when a 1 in 232,000 random match probability is combined with the other evidence introduced at [Napper]'s trial, there is no reasonable

70

probability of a change in outcome. The victim picked both [Napper] and his car out of separate lineups. Although the victim could not or did not identify [Napper] via closed-circuit television at trial, the victim indicated that he was positive when he picked [Napper] out of a pretrial lineup, and the circumstances surrounding that pretrial identification (the victim's smile when the camera panned on [Napper]) further reinforces the identification. A composite sketch drawn from the victim's descriptions was consistent with [Napper]'s appearance. The exterior and interior of [Napper]'s house, along with his yard, were consistent with the descriptions given by the victim to law enforcement. Purple clothing found in [Napper]'s house and car were also consistent with the victim's prior descriptions, as was a dark baseball cap recovered from [Napper]'s car. The color of the interior of [Napper]'s car was consistent with the victim's description, and the exterior of the car was damaged in a way that was consistent with the victim's brother's description. And the bottle of orange cocoa butter lotion found in [Napper]'s house matched the victim's description of "orange grease" used by the perpetrator.

At trial, E.T. identified from photographs various items that looked like items he encountered when he was kidnapped: the outside of [Napper]'s house, the brown couch, the purple clothes, and a Houston Oilers cannister. E.T. pointed to circles on [Napper]'s sidewalk that he recognized.

[Napper]'s defensive evidence was not helpful. His alibi was full of holes. Although electronic monitoring established that [Napper] arrived home at 3:07 p.m., that arrival time did not exclude him as the perpetrator. The family members who attempted to establish an alibi gave testimony that was inconsistent with each other and with their own prior statements, resulting in estimates for [Napper] leaving the Savage residence ranging from 1:30 to 3:30 p.m.  The prosecution effectively exploited David Savage's testimony that he saw [Napper] on television on February 12th, at which time [Napper] was not a suspect, but the composite drawing was being shown. Finally, [Napper] himself stated that the victim was taken to an apartment "before he come to my house."  It is not apparent how this could be taken as anything other than an inadvertent admission that the child was at [Napper]'s house.

The jury also heard [Napper]'s refusal to acknowledge responsibility for any of the offenses he had already been convicted of. And [Napper]'s testimony, some of which was evasive, showed his disregard for the geographical-limitation conditions of his parole and his numerous violations of those conditions.

[Napper]'s testimony also suggested his own consciousness of guilt, as he advanced implausible explanations in an attempt to distance himself from evidence that tended to link him to the crime: He denied owning the cocoa butter lotion—saying that he must have taken it from his brother's room and that it was owned by his brother's sister. And [Napper] denied that his car was damaged on February 11th, claiming that the police must have caused the damage while the car was in their custody. And he accused parole officer Butler of lying about the conditions of his parole. All of the evidence shows a very strong case against [Napper], even when Bromwich's criticisms of the HPD Crime Lab's conduct are taken into account.

Finally, we conclude that the new test results from ReliaGene and Orchid Cellmark do not alter the prejudice analysis in [Napper]'s favor. It is not a foregone conclusion that an "effective" attorney would have sought further testing upon discovering the errors committed by the HPD Crime Lab in this case. [*See Skinner v. State*, 293 S.W.3d 196, 202-03 (Tex. Crim. App. 2009) ("counsel explained that he did not ask for testing because he was afraid the DNA would turn out to be appellant's").] Even so, we have already explained, in connection with the *Youngblood* discussion, that the test results from ReliaGene and Orchid Cellmark were not exculpatory, but rather tended to incriminate [Napper].

*Ex parte Napper*, 322 S.W.3d at 249-51 (footnote omitted). After determining that Napper failed to demonstrate the requisite prejudice, the Texas Court of Criminal Appeals concluded further Napper did not establish that Greenlee was constitutionally ineffective for failing to retain the assistance of a DNA expert or pursue additional testing.

In reaching this decision, the Texas Court of Criminal Appeals identified and followed the correct legal standard found in *Strickland* and its progeny. Under this standard, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91. In assessing the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a

reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).  A habeas corpus petitioner who alleges a failure to investigate on the part of his counsel must demonstrate with specificity what the investigation would have revealed and how it would have changed the outcome of his trial.  *See Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

There is no evidence that the outcome of his trial would have been any different here if a DNA expert had been retained by Greenlee prior to trial.  As the record indicates, Napper's case was selected for additional DNA testing, which was performed by two independent companies (ReliaGene and Orchid Cellmark).  The results of this additional testing were of no ultimate benefit and tended to inculpate, rather than exculpate Napper as the perpetrator.  Under these circumstances, defense counsel's failure to hire an expert or request an continuance to conduct additional testing does not "so [undermine] the proper functioning of the adversary process that the trial cannot be relied upon as having a just result." *Knox v. Johnson*, 224 F.3d 470, 479 (5th Cir. 2000).  It follows that Napper does not establish actual prejudice as the result of his counsel's failure to hire a DNA expert or to pursue additional DNA testing.  More importantly, Napper does not show that the Texas Court of Criminal Appeals's decision to deny relief was unreasonable.  Accordingly, Napper does not demonstrate that he is entitled to relief under 28 U.S.C. § 2254(d).

### (2)    Failure to File a Motion to Suppress the Pretrial Identification

Napper complains that Greenlee was deficient for failing to file a motion to suppress the video line-up in which the complainant identified him as the perpetrator.  In particular,

Napper claims that Greenlee did not move to suppress the video prior to trial because he did not actually view the video before trial. The respondent maintains that this claim is without merit because Napper does not articulate any theory in which the videotape could have been suppressed.

The Due Process Clause prohibits identification testimony at trial that derives from impermissibly suggestive procedures, which may lead in turn to an irreparably mistaken identification. *See Stovall v Denno*, 388 U.S. 293, 302 (1967). For example, a conviction based on an eyewitness identification at trial following a pretrial photographic identification may be set aside "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Likewise, an identification obtained by an unduly suggestive line-up may be excluded if, based on the totality of circumstances, there is a likelihood that a misidentification has resulted. *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

Napper does not allege facts or show that the line-up procedure was unduly suggestive and he does not otherwise establish that the pretrial identification was improperly obtained. (*Amended Petition*, Doc. # 25, at 34-36). Napper's conclusory allegations are insufficient to raise a constitutional issue on collateral review. *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . to be of probative evidentiary value."). Absent a showing that counsel failed to file a meritorious motion and that the outcome would

74

have been different, the petitioner fails to demonstrate deficient performance or actual prejudice. *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (holding that counsel was not deficient in failing to present a meritless argument) (citation omitted); *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *Lavernia v. Lynaugh*, 845 F.2d 493, 499 (5th Cir. 1988) ("Counsel cannot be faulted for failing to pursue meritless motions.") (citations omitted); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) ("Counsel is not required to engage in the filing of futile motions.").

Because Napper does not show that a motion to suppress would have been successful, he fails to establish a valid claim for ineffective assistance of counsel in connection with this issue. More importantly, Napper does not demonstrate that he is entitled to relief on this claim.

### (3)    Failure to Prepare Napper to Testify

Napper contends that Greenlee was deficient for failing to prepare him to testify in his own defense. In particular, Napper argues that Greenlee should have instructed him not to comment on his criminal record or to make himself "appear to be a danger to society." Napper acknowledges that, while Greenlee warned him about the dangers of testifying, he failed to prepare him adequately for trial and was unprepared to elicit his side of the story. This claim is without support in the record.

The record reflects that Napper was uncooperative throughout the trial, including direct and cross-examination, where he argued repeatedly with his own attorney, the

prosecutor, and the trial court. *See Court Reporter's Record*, vol. 9, at 82-84, 177-78, 180-81, 195, 208, 212-13, 238-39, 245. Napper's decision to testify stemmed, at least in part, from his insistence on calling two parole officers to testify about the GPS monitor that he was required to wear as part of the Super Intensive Supervision Program. *See id*. at 84. Napper evidently believed that the GPS system could track his movements on the day of the offense and establish an alibi. *See id*. During a conference outside the jury's presence, Greenlee explained that he spoke with Napper "at great length" about the consequences of calling the parole officers as witnesses because it meant that Napper's criminal record would be open for cross-examination. *See id*. at 79-86. The trial court confirmed that the prosecution would be able to question the witnesses about Napper's prior convictions. *See id*. at 81-84. Greenlee also noted for the record that he advised Napper not to take the witness stand. *See id*. at 85-86.

Based on its own review of the transcript, the Court agrees that Napper's testimony, which the Texas Court of Criminal Appeals characterized as "evasive" and "implausible," *Ex parte Napper*, 322 S.W.3d at 250, did little to help his defense and made his counsel's job even more difficult in light of the evidence against him. In light of Napper's own decision to present testimony from his parole officers, Napper does not demonstrate that his criminal record was inadmissible or exempt from cross-examination. Nor does he propose what additional advice his attorney could have provided to prepare him more fully to testify. The record, which reflects that Greenlee questioned his client with great care during direct examination, does not support Napper's assessment that Greenlee had "no idea" what Napper

was going to say or that Greenlee was unprepared to present a defense.  As the Texas Court

of Criminal Appeals concluded, Napper does not show that counsel was to blame for the

damaging effect of his testimony:

> No one forced [Napper] to take the testify that the complainant was taken to
> his house, that the cocoa butter lotion found at his house was not his, that one
> of his parole officers lied, that [Napper] had no regularly scheduled reporting
> date [for his parole], or that he did not commit the sex offenses for which he
> was previously convicted.

*Ex parte Napper*, 322 S.W.3d at 250, n.181.  Given Napper's insistence on telling the jury

his own side of the story, the Court is not persuaded that Napper would have followed advice

from counsel if it had been given.  Under these circumstances, Napper does not establish that

his attorney was deficient.  It follows that Napper fails to establish a valid claim for relief on

this issue.

### (4)      Failure to Make an Opening Statement

Napper alleges that Greenlee was deficient for failing to make an opening statement.

(*Amended Petition*, Doc. # 25, at 58).  The respondent argues that, in addition to being

barred for other reasons, this claim is without merit.  The Court agrees.

As Greenlee explained to the jurors during his summation, there is "no legal

requirement to make an opening statement."  *Court Reporter's Record*, vol. 10, at 15.  The

Fifth Circuit has recognized that the decision whether to make an opening statement is a matter of trial strategy and that the failure to make one is not necessarily unreasonable:

> It is next said that the attorney failed to make an opening statement to the jury. Certainly, this was a matter of professional judgment, and in this kind of case was very likely the wiser course to follow. The best hope of defense counsel on the facts here involved was to catch the prosecution asleep or lacking evidence at some fatal juncture of the trial. It could well be considered that this was no time for defense counsel, at the very outset, in an opening statement to reveal the weak hand he had to play.

*Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965); *see also Huffington v. Nuth*, 140 F.3d 572, 583 (4th Cir. 1998) (noting that waiver of opening statement is a tactical decision and not objectively unreasonable). In this case, it appears that trial counsel made a strategic decision to waive an opening statement in order to more effectively challenge the state's evidence, which was substantial. Although this type of decision may not be lightly made, it is also not one subject to second-guessing on habeas corpus review. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) ("While opening and closing statements are not to be lightly waived in a capital case, it is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel.").

Napper does not articulate facts showing what, if anything, an opening statement would have accomplished in his case, which involved allegations of kidnapping and sexual assault of a young child. Napper does not demonstrate that the trial would have ended differently, but for his attorney's decision to waive an opening statement. *See Nguyen v. Reynolds*, 131 F.3d 1340, 1350 (10th Cir. 1997) (holding that "[d]efense counsel's failure

to make an opening statement was nothing more than a tactical decision that did not adversely affect [the defendant]"). Under these circumstances, he does not articulate a valid claim for ineffective assistance of counsel. *See, e.g., United States v. Stedman*, 69 F.3d 737, 740 (5th Cir. 1995); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984).

### (5)    Cumulative Error

Napper contends that the he is entitled to relief because of the cumulative effect of errors by his trial counsel and the State's failure to afford him with an opportunity to conduct independent DNA tests.  As the respondent correctly notes, the Fifth Circuit has repeatedly rejected allegations of cumulative error that are unaccompanied by a valid ineffective-assistance claim.  *See Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (acknowledging that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised"); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) ("Federal habeas relief is only available for cumulative errors that are of a constitutional dimension."); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993) (stating that, because certain alleged errors were not of constitutional dimension and because others were meritless, the petitioner had "presented nothing to cumulate"); *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.").

Napper has failed to establish a valid ineffective-assistance claim in this case or to show that his conviction was tainted by a constitutional violation.  As a result, his allegation of cumulative error fails to state a claim.  *See Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (concluding that, "where individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'").  Because Napper has failed to show that he is entitled to relief on any of his claims, the respondent is entitled to summary judgment and the petition will be denied.

## IV.    REQUEST FOR AN EVIDENTIARY HEARING AND DISCOVERY

Napper argues that summary judgment is not appropriate at this state of the proceedings without additional factual development through discovery and an evidentiary hearing.  The Supreme Court has clarified, however, that habeas corpus review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398 (2011).  Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Id.* at ___, 131 S. Ct. at 1400.

*Pinholster* harmonizes with the limitations on factual development from the AEDPA and traditional habeas jurisprudence.  Section § 2254(e)(2) prohibits an evidentiary hearing if a petitioner "failed to develop the factual basis of a claim in State court proceedings" unless he meets limited exceptions.  Napper, who had more than one state court evidentiary

proceeding in which he was represented by counsel, does not explain his failure to develop all necessary facts in state court.

Even so, "overcoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing, it merely opens the door for one[.]"  Murphy v. Johnson 205 F.3d 809, 815 (5th Cir. 2000).  "The decision whether to conduct an evidentiary hearing is left to the sound discretion of the district court[.]"  *Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001); *see also Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus").  This Court has been able to resolve all issues raised in this case by referring to the pleadings, the extensive state court records, the trial and hearing transcripts, as well as the many exhibits.  Accordingly, the court denies Napper's request for an evidentiary hearing.

Likewise, Napper has not shown that discovery is necessary to a fair adjudication of his claims.  "Rule 6 of the Rules Governing § 2254 cases permits discovery only if and only to the extent that the district court finds good cause."  *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000); *see also Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000).  To justify discovery, a petitioner's factual allegations "must be specific, as opposed to merely speculative or conclusory[.]"  *Murphy,* 205 F.3d at 814; *see also Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).  In support of his request for discovery, Napper merely avers in general that summary judgment would be "premature" without first affording an opportunity for fact-finding on his claims.  This conclusory request falls far short of the showing of good

cause necessary to permit discovery under Rule 6.  Accordingly, the court denies Napper's request for leave to conduct discovery.[9]

## VI.    CERTIFICATE OF APPEALABILITY

Because the habeas corpus petition filed in this case is governed by the AEDPA, codified at 28 U.S.C. § 2253, a certificate of appealability is required before an appeal may proceed.  *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability).  "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).  Rule 11 of the Rules Governing Section 2254 Cases now requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment

---

[9]    To the extent that his request could be construed as a motion for a continuance under Rule 56(d), he has not shown by affidavit or declaration that, for specified reason, he is unable to present facts essential to his case or his opposition to the respondent's motion. *See* FED. R. CIV. P. 56(d).  Napper does not otherwise provide details about what discovery he needs.  His conclusory allegations fall well short of the good cause necessary to permit discovery under Rule 6.  Nor does he show that a continuance to conduct discovery would yield a genuine issue of material fact.

of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).   Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336.   Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The Court concludes that reasonable jurists would not debate whether the petition should have been resolved in a different manner.  Likewise, the Court concludes that jurists of reason would not debate whether any procedural ruling in this case was correct or whether the petitioner has stated a valid claim of the denial of a constitutional right.  Therefore, a certificate of appealability will not issue.

## VII.   CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.     The respondent's motion for summary judgment [Doc. # 30] is **GRANTED**.

2.     The petition for a writ of habeas corpus is **DENIED**, and this case is

**DISMISSED** with prejudice.

3.     A certificate of appealability is **DENIED**.

4.     The order appointing the Federal Public Defender to represent petitioner [Doc.

# 7] is **TERMINATED**.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas, on May 31, 2012.

Nancy F. Atlas
United States District Judge